# United States Court of Appeals
## For the <u>First Circuit</u>

No. 08-1045

STEPHEN PARKER,
Plaintiff, Appellee,

v.

KEVIN GERRISH,
Defendant, Appellant,

and

CITY OF SOUTH PORTLAND; SOUTH PORTLAND POLICE DEPARTMENT;
EDWARD GOOGINS, in his individual and official capacities;
JEFFREY CALDWELL, in his individual and official capacities;
and TODD BERNARD, in his individual and official capacities,
Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. David M. Cohen, <u>U.S. Magistrate Judge</u>]

---

Before

Torruella, Boudin, and Dyk,[*]
<u>Circuit Judges</u>.

---

    <u>Edward R. Benjamin, Jr.</u>, with whom <u>Thompson & Bowie, LLP</u>, was on brief for appellant.
    <u>Benjamin R. Gideon</u>, with whom <u>Berman & Simmons, P.A.</u>, was on brief for appellee.

---

November 5, 2008

---

[*]  Of the Federal Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  A jury found in favor of plaintiff, Stephen Parker, on his claim that defendant, Officer Kevin Gerrish of the South Portland Police Department, violated his constitutional rights by using his Taser during the course of arresting Parker for operating a motor vehicle while under the influence of alcohol.  The jury awarded $111,000 to Parker, who complained that the use of the Taser and subsequent cuffing caused nerve damage to his arm and injured his shoulder.  After trial, the district court denied Gerrish's motions for judgment as a matter of law and a new trial.  On appeal, Gerrish disputes the finding of excessive force, argues that he is entitled to qualified immunity, and challenges the district court's answer to a jury question as responsible for an inappropriate damages award.  After careful review of the record, including a videotape recording of the incident, we affirm.

## I.  Background

### A.  Facts

We present the facts by construing the evidence in the light most hospitable to the jury's verdict.  Jennings v. Jones, 499 F.3d 2, 7 (1st Cir. 2007).  To clarify our later discussion, we also note some points of dispute.

At around noon on July 20, 2005, Parker and his girlfriend went boating.  While on the boat, Parker consumed "3 or 4" 16 ounce cups of a cocktail of ginger ale and whiskey.  At

around 7:00 PM, Parker docked his boat in the marina and proceeded to drive his girlfriend home. While driving home, Parker passed Gerrish, who was serving a warrant with Officer Jeffrey Caldwell. Gerrish observed Parker's vehicle, visually estimated that Parker was speeding, pursued Parker, and effected a traffic stop. When Gerrish turned on his police lights, a video camera began recording. The video recording did not include audio. This recording indicates the time of the stop to be approximately 7:49 PM.

Gerrish asked Parker for his license and registration and noticed indicia of intoxication. Parker admitted to Gerrish that he had three or four drinks. At trial, Parker did not dispute that he was intoxicated at the time of the stop. Gerrish ordered Parker to exit the vehicle, and Parker complied. Gerrish and Parker moved behind Parker's vehicle, in direct view of the video camera. Parker cooperated with Gerrish through a number of sobriety tests, which Gerrish found indicated that Parker was intoxicated.

In one test, Gerrish asked Parker to stand on his left foot. Gerrish demonstrated the procedure a number of times. Parker attempted the test but eventually began hopping, lost his balance, spun around, placed his hands on his vehicle, and said, "[D]o what you got to do." Parker expected to be arrested and Gerrish understood that Parker was giving himself up for arrest. At this point, approximately 7:57 PM on the video recording,

-3-

Gerrish had been questioning Parker for approximately seven minutes.

Caldwell arrived on the scene during earlier tests, but was not initially within view of the video camera. Caldwell testified that his badge was on display and that he did not intervene in Gerrish's interview of Parker. But Parker testified that Caldwell's badge was not on display at first and that he did not learn until later in the encounter that Caldwell was a police officer. Parker further testified that Caldwell made intimidating gestures at Parker, shouted at Parker, and led Parker to be confused at some of Gerrish's instructions. Specifically, Parker testified that after he turned to place his hands on his truck, Caldwell was being "boisterous" and ordered him to turn back around. Gerrish also ordered Parker to turn around. Parker complied by turning back around, but admits that as he turned back to face the officers, he gave Caldwell the finger and said, "I don't even know who the fuck you are." Parker then crossed his arms in front of his chest. Parker also admits that he earlier said, "Fuck you," to Caldwell as he was placing his hands on the back of the truck.

Though Gerrish had already decided he would arrest Parker regardless, Gerrish asked Parker to rate his own intoxication on a ten point scale. Gerrish then attempted to physically uncross Parker's arms and place him under arrest. Gerrish readied his

handcuffs while grabbing Parker's arm, which was still crossed in front of his chest. Gerrish tried to move Parker's arm, but Parker resisted. Parker testified that he didn't hear Gerrish at that time as he was distracted by Caldwell.

Gerrish then stepped back, drew his Taser, and ordered Parker to turn around and place his hands behind his back. Parker complied, turned around, and clasped his right wrist with his left hand. Gerrish handed his handcuffs to Caldwell, who had recently entered the range of the video recorder. As Caldwell approached Parker, Parker told Caldwell that he was not afraid of him. Caldwell testified that he stepped back and was concerned there would be a struggle. But Caldwell then proceeded to cuff Parker's left wrist in two seconds. Caldwell then ordered Parker to release his own clasped right wrist. At first, Parker did not comply. Police Sergeant Todd Bernard, an officer who arrived on the scene, and Caldwell testified that Parker was warned that he would be "tased" if he did not comply. Parker testified that he never heard a warning.

Caldwell then applied force to Parker's right hand in an effort to get Parker to release his wrist. Since what happened next is at the heart of the case, we will recount each witness's perspective. Parker testified that at this point he released his grip and was then shot with the Taser. Caldwell testified that Parker let go of his right wrist, and then Parker's right hand

-5-

moved as if Parker was attempting to escape or attack. Caldwell testified that he then grabbed the right arm. Gerrish testified that he saw Parker's hand release, but the rest of Parker's right arm was obscured by Caldwell. Nonetheless, Gerrish and Caldwell both testified that Parker dipped his shoulder and began to swing his right arm up. Gerrish testified that he saw Caldwell, "dip forward and appear to come up on his tiptoes as if he was being pulled off balance." At this point, Gerrish fired his Taser.

Gerrish did not verbally announce the use of his Taser as is recommended. Caldwell was surprised by Gerrish's use of the Taser. Caldwell testified that approximately one second elapsed between when Parker released his grip and when Gerrish fired the Taser. On cross examination, Gerrish agreed that nothing Parker did prior to this instant "either in themselves or even in collectivity" justified the use of the Taser. Rather, Gerrish explained that he fired the Taser when he "saw a threat to Officer Caldwell" and "reacted."

On cross examination, Parker conceded that he had "resist[ed]" "physically but not mentally" Gerrish's attempts to uncross his arms and was confused at the time since Caldwell was also talking and telling him to turn back around. Parker further testified that after placing his hands behind his back, he "initially resisted" Caldwell's attempt to get him to release his grip since he was not instructed how to place his hands and already

-6-

thought they were as close as they could get.  Parker further admitted that Caldwell told Parker he was resisting arrest and that Caldwell was "prying my hands apart."  Nonetheless, Parker maintained that he then voluntarily released his hand, testifying, "While he was prying I let go."  He further testified that he was shot with the Taser immediately after letting go.

The video recording reveals that approximately six seconds elapsed between the cuffing of the left hand and the firing of the Taser, during which time Caldwell was attempting to cuff Parker's right hand.  Though Parker's right arm is obscured behind Caldwell in the video, Gerrish maintains on appeal that Parker's "dramatic" move is evident from the video recording.  But the video recording shows only minimal movement by Parker at this key moment.  In fact, Caldwell admitted that the movement he described Parker making just before he was shot with the Taser is not clearly visible on the video.  The video does show some movement by Caldwell just before Gerrish fired the Taser.  But, the video does not clearly reveal a "dramatic" move by Parker before Gerrish fired the Taser.

At the time that Gerrish fired the Taser, there were three officers on the scene.  Bernard arrived on the scene approximately five to ten seconds before Gerrish fired the Taser.  Gerrish was aware of Bernard's presence before he fired his Taser.

Bernard also drew his Taser. Bernard did not fire his Taser, but explained that he had assumed a backup role to that of Gerrish.

The parties did not dispute that Parker was unarmed and never assaulted or attempted to assault the officers on the scene. Gerrish also testified that Parker became increasingly frustrated as the encounter progressed. Parker did not dispute that at times he flexed his muscles and made gestures that were defiant.

Prior to the cuffing, Parker did not attempt to escape. Nonetheless, the officers testified that when Parker moved his arm, they feared that he was trying to escape and that he could fight them using his handcuff as a weapon. As stated above, Parker maintained he made no such move. Gerrish explained that physically grappling with a resisting arrestee can be risky and dangerous and that he deployed his Taser to prevent such a struggle.

Evidence adduced at trial showed that a Taser works by firing two probes and transmitting a 50,000 volt charge for five seconds. A Taser strike incapacitates by causing involuntary muscle paralysis. In this case, the Taser probes attached to Parker's left arm. The charge caused Parker to fall to the ground. On the ground, Caldwell applied force to cuff Parker, pulling his arms back and lifting his head up off the ground on two occasions. During the cuffing on the ground, Parker felt a pain in his shoulder. According to one of Parker's physicians, Dr. Elwood Fox, Parker "sustained two injuries" as a result of the tasing incident:

"a radial nerve injury . . . that resulted in numbness to the left thumb area" and "a full thickness rotator cuff tear to the left shoulder."  Gerrish questioned the cause of the rotator cuff tear, noting that Parker had not initially complained about it and arguing that any injury would have been caused by Caldwell's cuffing procedure and not Gerrish's Taser discharge.  But Dr. Fox explained that such tears were usually caused by trauma and could worsen over time.  Parker testified as to his medical treatment as well as to the pain he experienced during and after the incident.  Parker explained that being shot with the Taser made him feel like he could not breathe.  He testified, "I'd like to say it felt like a bolt of lightning, but I've never been struck by a bolt of lightning."  Parker also missed some periods of work, though the parties disputed the cause of the various absences.

At trial, the parties also elicited evidence regarding police procedures.  The South Portland Police Department trains its officers in the use of the Taser,[1] and lists the Taser just below deadly force on its use of force continuum.  Department policy requires officers to use the least amount of reasonable force necessary to take someone in to custody.  When asked on cross examination if having Bernard apply "soft hand control" to complete

---

[1] During the training, Gerrish voluntarily submitted to being "tased" for one second.  Before being "tased," Gerrish signed a release recognizing the risk of, among other things, uncontrolled falls.

the cuffing should have been the first resort instead of the Taser, Gerrish replied, "In a perfect world, yes, it would have been." Gerrish later clarified that he viewed the Taser as appropriate since soft hand control had failed and the Taser and other control techniques existed to avoid a dangerous knock-down fight.

Parker also called an expert, John Ryan, a retired police officer with experience in police training. Ryan rendered an opinion that Gerrish's use of the Taser "was inconsistent with generally established police practices." Ryan explained that in assessing the physical threat, police officers normally take into account whether a subject is armed, as well as the size and relative number of officers compared to offenders. As was undisputed at trial, Parker is 220 lbs, but Gerrish is larger. Notably, Ryan testified that it is natural for an arrestee to move while separating hands for cuffing. Ryan concluded that "essentially the Taser is used because his arms move when he's directed to move them." Ryan explained that officers regularly have difficulty securing the second cuff, and that it is normal for the arresting officer to bend down or dip his shoulder in the process. Though Gerrish agreed that arrestees sometimes tense or flinch while in the uncomfortable cuffing position, Gerrish disputed Ryan's testimony that Caldwell's bending over to complete cuffing was routine, stating he had only seen an officer in such a position where an arrestee was resisting.

-10-

Ryan also identified other considerations supporting his opinion. Ryan testified that Parker appeared frustrated but compliant. Ryan also noted that for much of the encounter, Gerrish stood at ease, and not in what Ryan described as the "bladed stance" that officers are taught to assume when they perceive a threat. Gerrish later admitted that he would have assumed such a stance had he perceived a threat. Ryan similarly noted that Gerrish allowed Parker to put his hands in his pockets. Ryan testified that an officer would not have allowed Parker to put his hands in his pockets if he perceived Parker to be a likely threat. The video tape and later testimony also revealed that Caldwell's hands were in his pockets during the brief time from when he entered the video camera's view until he was handed the handcuffs.

Gerrish did not call an expert.

## B. Procedural History

Initially, Parker sued Gerrish, Caldwell, Bernard, the City of South Portland, the South Portland Police Department, and Edward Googins, the chief of police. Parker asserted claims against Gerrish, Caldwell, and Bernard for negligence and use of excessive force, in violation of 42 U.S.C. § 1983 and the Maine Civil Rights Act. Parker asserted supervisory and municipal liability under 42 U.S.C. § 1983 against the city, department, and police chief.

On the defendants' motion for summary judgment, the district court found that the officers used reasonable force in cuffing Parker after the Taser discharge. As such, the district court ruled for Caldwell and Bernard on all claims against them. Further finding no basis for municipal liability, the district court granted summary judgment in favor of the supervisory defendants. The district court refused to grant summary judgment to Gerrish, finding a genuine dispute of material fact as to the use of excessive force. The district court also denied Gerrish's request for qualified immunity, finding that, construing facts in the light most favorable to Parker, Gerrish may have unreasonably violated a clearly established right by using excessive force against Parker. Parker v. City of S. Portland, No. 06-129, 2007 U.S. Dist. LEXIS 37015, at *78-88 (D. Me. May 18, 2007).

After Gerrish testified at trial that he intentionally deployed the Taser, Parker orally dismissed his negligence claim. Thus, the case went to the jury only on Parker's state and federal excessive force claims against Gerrish.

At the close of plaintiff's case, Gerrish orally moved for a judgment as a matter of law under Fed. R. Civ. P. 50(a). Though the motion did not refer to "qualified immunity" or to "clearly established law," Gerrish contends he adequately raised that issue. The district court denied Gerrish's motion and denied a renewed motion at the close of evidence.

After closing arguments, the district court instructed the jury. No party objected as the judge instructed the jury on legal causation, multiple causation, and independent intervening events. After deliberation, the jury returned with a written question:

> The plaintiff testified the shoulder popped as a result of the officer's actions after the tasing. Gerrish did not appear to be around Parker after he fell to the ground. Therefore, is Gerrish responsible for the injuries to the plaintiff as a result of the incident on the ground?

After consulting with the litigants, the district court judge replied in writing:

> Members of the jury: the Court cannot provide you with an answer to the question you ask. You must first decide by applying my instructions on the law to the facts as you find them whether Mr. Parker has proven by a preponderance of the evidence that the defendant's use of the Taser device constituted unconstitutionally excessive force. If and only if your answer to that question is "yes," you must then decide whether any injuries you find Mr. Parker sustained were legally caused by Officer Gerrish's use of the Taser device, again by applying the instructions I have given you on causation and otherwise. My instructions on causation appear on pages 8 and 9 of the instructions.

Gerrish lodged an objection to this response. He argued that by virtue of Caldwell and Bernard's dismissal on summary judgment, the district court should have instructed the jury that Gerrish could

not be liable for injuries caused by Caldwell or Bernard while Parker was on the ground.

The jury returned with a verdict for Parker and awarded compensatory damages of $111,000. Gerrish then moved for judgment as a matter of law under Fed. R. Civ. P. 50(b) arguing that there was no excessive force and that Gerrish is entitled to qualified immunity. In the alternative, Gerrish requested a new trial under Fed. R. Civ. P. 59, challenging the response to the jury question. The district court denied both motions. Gerrish now appeals this denial.

## II.  Discussion

### A.  Excessive Force

In reviewing decisions on motions for judgment as a matter of law, we "review questions of law *de novo*, but review the sufficiency of the evidence drawing all reasonable inferences in favor of the prevailing party." Negrón v. Caleb Brett U.S.A., Inc., 212 F.3d 666, 668 (1st Cir. 2000). "Our review is weighted toward preservation of the jury verdict; 'we must affirm unless the evidence was 'so strongly and overwhelmingly' inconsistent with the verdict[] that no reasonable jury could have returned [it].'" Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002) (quoting Walton v. Nalco Chem. Co., 272 F.3d 13, 23 (1st Cir. 2001)). "We cannot evaluate 'the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence,' and we

-14-

must affirm unless 'the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome.'" Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998) (quoting Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994)).

The standard for assessing claims of excessive force is established:

> To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances. Whether the force used to effect a particular seizure is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." The reasonableness inquiry is objective, to be determined "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." There must be "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

Jennings, 499 F.3d at 11 (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)) (citations omitted). We have also noted that the "'calculus of reasonableness' must make 'allowance' for the need of police officers 'to make split second judgments--in circumstances that are tense, uncertain and rapidly evolving--about the amount of force that is necessary in a particular situation.'" Berube v.

-15-

Conley, 506 F.3d 79, 83 (1st Cir. 2007) (quoting Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)).

The use of expert testimony is permissible in assisting the jury in evaluating claims of excessive force. See Jennings, 499 F.3d at 15 (explaining that while such testimony is neither required nor always appropriate, expert testimony can be helpful to jurors in explaining police control techniques unfamiliar to many jurors).

Here, the facts and circumstances identified in Jennings and Graham support the jury's conclusion that Gerrish's use of the Taser was not reasonable under the circumstances. First, the seriousness of the offense weighs in favor of Parker. Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault. Cf. Begay v. United States, 128 S. Ct. 1581, 1586 (2008) (finding DUI not to be a crime of violence under the Armed Career Criminal Act, noting that it is not defined by "violent, and aggressive conduct" (internal quotations marks omitted)). Further, since Parker complied with Gerrish's requests and exited the vehicle voluntarily, he no longer posed a threat of driving while intoxicated.

Though the offense of resisting arrest could certainly pose a risk to an arresting officer, the evidence presented to the

jury could allow it to find that Parker was not meaningfully engaged in this offense. First, Parker testified that he voluntarily released his hands. Second, as police expert Ryan testified, officers routinely encounter difficulty getting suspects to align their hands for cuffing.

Even to the extent Parker initially resisted releasing his hands for cuffing, a jury could find this resistance <u>de minimis</u> in light of the circumstances. Caldwell's attempt to get Parker to release his hand lasted only a few seconds. Parker testified that he released his hand and was then immediately shot with the Taser. Gerrish and Caldwell testified that Parker made a "dramatic" move, which pulled Caldwell off balance, leading them to fear an attack or attempted escape. But, considering Parker's testimony, the videotape, and police expert Ryan's testimony that Caldwell's repositioning during cuffing was routine, a reasonable jury could conclude that Parker made no "dramatic" threatening move. Thus, the evidence supports the conclusion that Parker was not engaging in a serious offense which itself would justify the use of force.

Gerrish urges us to ignore Parker's testimony and focus on the videotape. He argues that the Supreme Court has permitted such a change in the standard of review by holding that at summary judgment, a court may ignore a visible fiction in testimony and instead "view[] the facts in the light depicted by the videotape." <u>Scott</u> v. <u>Harris</u>, 127 S. Ct. 1769, 1776 (2007). Even if this

-17-

proposition applied when reviewing a motion for judgment as a matter of law, a proposition we need not reach, it would not help Gerrish here. As noted above, we do not view the video recording in this case as depicting significant resistance. Considering the video recording together with the testimony, the jury could reasonably find excessive force.

As to the second Graham factor, the jury could reasonably have concluded that Parker did not pose an immediate threat to the safety of the officers. Gerrish contends that he had only a second to evaluate Parker's arm movement and decide that Caldwell was threatened. We allow for an officer's need to make calculations in rapidly evolving circumstances, but here the seven minute encounter demonstrated that Parker was largely compliant. The officers did not treat Parker as a threat during the encounter. And as explained above, a jury could have concluded that Parker simply released his hand and did not raise his arm as Caldwell was cuffing him.

That Parker was earlier insolent or frustrated does not change this conclusion. As Gerrish acknowledged, a reasonable officer would not discharge his Taser simply because of insolence. We do consider the totality of the circumstances in assessing the reasonableness of the use of force. In some circumstances, defiance and insolence might reasonably be seen as a factor which suggests a threat to the officer. But here Parker was largely

-18-

compliant and twice gave himself up for arrest to the officers. Further, as Gerrish admitted, that Parker earlier harassed or resisted the officers does not justify the later use of the Taser. Cf. Jennings, 499 F.3d at 14-15 (finding a use of force unreasonable where an officer "increased the force he used after [the arrestee] ceased resisting"). Considering all of this evidence, the jury could reasonably have concluded that Parker did not pose an immediate threat.

Finally, as explained above, a jury could have found that Parker was not actively resisting or attempting to flee. Gerrish points to Parker's admission on cross examination that he "resisted" Gerrish's attempt to uncross his arms and Caldwell's initial attempts to get him to release his grasp on his own wrist. Against this admission the jury could have considered Parker's general compliance, the shortness of the time during which Parker did not position his arms as the officers desired, and the expert testimony that difficulty in securing cuffs was routine. The jury could reasonably have concluded that under such circumstances, Parker presented no significant "active resistance" or threat.

When considering whether it was reasonable for Gerrish to fire his Taser in light of these facts, the jury could turn to testimony about the strong incapacitating effect of the Taser and the fact that the South Portland Police Department considered the Taser just below deadly force in its "continuum" of force. See id.

-19-

at 14-15 (explaining that testimony about the use of force continuum can properly inform the jury about the proportionality of force needed under the circumstances). Gerrish contends that the use of the Taser was proper as Parker did not respond to his "soft hand control." But since the jury could have found that Parker simply released his hand and made no "dramatic" threat, the jury could have concluded that "soft hand control" had not failed. We do not hold that the officers would have been required to physically wrestle Parker to the ground without recourse to the Taser. Rather, we find that the jury could have concluded that such a struggle would not have been necessary -- that in the absence of the Taser, Parker would have submitted to cuffing without presenting a risk to the officers.

Thus, it was not unreasonable for the jury to find Gerrish's use of the Taser to be excessive. Gerrish suggests that precedent precludes such a conclusion. First, he points to our recent decision in <u>Berube</u>, where we granted qualified immunity to police officers who repeatedly shot an attacker wielding a metal hammer, which some officers suspected was a gun. 506 F.3d at 84-85. Gerrish argues that that decision recognizes the discretion we afford officers responding to evolving threats. But, there, the first officer "was confronted by a much larger man charging her with what he has conceded was a dangerous weapon in his hand." <u>Id.</u> The later arriving officers in that case faced an arrestee who was

-20-

"rolling on the ground, refusing to obey their orders and potentially preparing to fire at them." Id. Thus, the situation in Berube required the officers to make instant judgments about an unfamiliar arrestee who was armed and apparently threatening them. In contrast, Parker largely complied with Gerrish's request for seven minutes, was unarmed, and did not pose an immediate threat.

Gerrish next compares this case to Draper v. Reynolds, where the Eleventh Circuit held that an officer, Reynolds, reasonably fired his Taser at a stopped driver, Draper, who yelled profanities at the police officer, repeatedly and defiantly challenged the officer's commands, and failed to produce his license and other documents after five requests. 369 F.3d 1270, 1278 (11th Cir. 2004). In that case, "[f]rom the time Draper met Reynolds at the back of the truck, Draper was hostile, belligerent, and uncooperative." Id. Draper "repeatedly refused to comply with Reynolds's verbal comments." Id. Considering the persistent hostility, the court found that attempting an arrest and cuffing "may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle." Id. As we have explained, this is a different case. Though Parker insulted the officers, he complied with Gerrish's requests and gave himself up for arrest. A reasonable jury could have found no likelihood of a serious physical struggle.

-21-

Accordingly, we find that the evidence in this case supports the jury's finding that Gerrish used excessive force when he fired his Taser at Parker.

## B. Qualified Immunity

Gerrish contends, in the alternative, that his decision to fire the Taser was at worst a reasonable mistake in judgment for which he should receive qualified immunity. Parker contends that Gerrish waived this defense by failing to raise it in his Rule 50(a) motion.[2]

---

[2] Gerrish's counsel's oral Fed. R. Civ. P. 50(a) motion in its entirety is as follows:

> Your Honor, at this point I'd like to make my motion under Rule 50 for judgment as a matter of law.
>
> I think the -- two separate issue in here, first, whether or not the plaintiff has made out an actual violation of the Fourth Amendment on unreasonable use of force. Obviously the Taser itself has not been declared by any Court as a per se unconstitutional use of force. And so I think that the issue is was the force used to overcome what Officer Gerrish perceived as physical resistance and a threat to Officer Caldwell unconstitutional and unreasonable and excessive.
>
> I think that Mr. Parker himself in his testimony admitted that he resisted, that he resisted the first attempts to take him into custody, and that just before he was tased that -- that he did not willingly give up his hands, that his hands had to be pried apart by Officer Caldwell and that at that point in time it's not just what is actually happening but what Mr. -- I'm sorry, what Officer

A motion under Fed. R. Civ. P. 50(a) must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).  The motion "must be sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion."  Zachar v. Lee, 363 F.3d 70, 73 (1st Cir. 2004) (citing Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995)). Such a motion "preserves for review only those grounds specified at the time, and no others." Id. (quoting Correa, 69 F.3d at 1196).  In this appeal we review the district's denial of Gerrish's renewed motion for judgment as

> Gerrish and any objectively reasonable officer in his position would have perceived as a threat, and the thought was lawful in response to it.  So I think that Mr. Parker's own testimony about his resistance defeats the Fourth Amendment claim.
>
> I think that what you can see on the video and what any reasonable juror would have to see is the reaction of Officer Caldwell.  And taken in conjunction with Mr. Parker's testimony that he was not giving up his hands and that they were having to be pried apart and then the reaction that you can clearly see on the video in the second before he's tased when -- when Officer Caldwell's body shifts dramatically and takes a dip and pushes forward, that at that point that an objectively reasonable officer in Officer Gerrish's position and under the totality of the circumstances of all he's seen up to this point in time could reasonably have inferred that there was a threat to Officer Caldwell, that he was resisting being taken into custody, and it justified the use of the Taser to overcome that resistance.

-23-

a matter of law under Fed. R. Civ. P. 50(b). But, "[a]s the name implies, a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is bounded by the movant's earlier Rule 50(a) motion." Correa, 69 F.3d at 1196. "The movant cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Id. Consistent with this general framework, we have held that even if a defendant raises qualified immunity at summary judgment, the issue is waived on appeal if not pressed in a Rule 50(a) motion. Isom v. Town of Warren, 360 F.3d 7, 9 (1st Cir. 2004) ("But the defendants did not raise immunity as an issue at the time of their Rule 50 motion, and so they have waived that defense as a grounds for the motion.").

Gerrish does not dispute this proposition, but rather argues that he did raise qualified immunity in his motion under Fed. R. Civ. P. 50(a). Gerrish admits that the oral motion did not use the term "qualified immunity," but argues that he addressed every prong of the qualified immunity analysis.

We assess qualified immunity using a three-part test: "'whether the plaintiff's allegations, if true, establish a constitutional violation,' 'whether the right was clearly established at the time of the alleged violation,' and 'whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right.'" Philip v.

Cronin, 537 F.3d 26, 34 (1st Cir. 2008) (quoting Suboh v. Dist. Attorney's Office, 298 F.3d 81, 90 (1st Cir. 2002)).

Gerrish contends that he dealt with the first prong of the qualified immunity analysis, whether there was a constitutional violation, while discussing the excessive force issue. While it is true that Gerrish argued that there was no constitutional violation, he argued only that issue and did not place it in the context of a qualified immunity argument.

Gerrish next points to his argument that "the Taser itself has not been declared by any court as a *per se* unconstitutional use of force." Gerrish contends that argument invoked the second prong of the qualified immunity analysis, whether his actions violated "clearly established" law. But this argument was made entirely in the context of an argument that there was no unconstitutional use of force. Gerrish did not refer to "clearly established law" and made no effort to address his argument to qualified immunity.

Similarly, Gerrish contends that he addressed the third prong of the qualified immunity analysis, whether a reasonable officer would have known that his conduct was unlawful, when he argued that "an objectively reasonable officer in Officer Gerrish's position" would have seen Parker's arm movement as a threat to Caldwell justifying the Taser usage. But, as noted above, the excessive force analysis is also keyed to the perceptions of an

-25-

objectively reasonable officer. Thus, Gerrish's discussion is again simply addressed to the argument that Gerrish did not use excessive force.

In this way, the oral Rule 50(a) motion only argued that the evidence was insufficient to support a finding of a constitutional violation. Though Gerrish stated that there were two issues, he only argued the excessive force issue. Gerrish did not specify qualified immunity as the legal basis for his motion or give the district court judge adequate notice that he was renewing that claim in this context. See United States v. Samboy, 433 F.3d 154, 161 (1st Cir. 2005)("To raise an argument on appeal, a party must 'spell out its arguments squarely and distinctly . . . or else forever hold its peace.'" (quoting Rivera-Gómez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988))). Accordingly, his qualified immunity defense is waived.

Though we have discretion "to relieve a party from the normal consequences of failure to proffer a defense" in a timely manner, we do so only to prevent a "miscarriage of justice" where "error is plain" and the equities heavily favor correcting that error. Correa, 69 F.3d at 1196. We need not conduct a detailed examination of the waived qualified immunity arguments to conclude that no such circumstances are presented here.

### C. Causation and Damages

Gerrish also appeals the district court's denial of his request for a new trial. Specifically, Gerrish argues that the district court erred in responding to the jury's question. According to Gerrish, this error impermissibly allowed the jury's damage award to include injury caused by Caldwell's cuffing of Parker after he was shot with the Taser and fell to the ground.

"In reviewing an award of damages, the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 245 (1st Cir. 2005) (quoting E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 502 (1st Cir. 1994)). After a mid-deliberation jury question, the decision "whether to provide a supplementary instruction to the jury 'is a matter within the sound discretion of the trial court.'" United States v. Roberson, 459 F.3d 39, 46 (1st Cir. 2006) (quoting Elliott v. S.D. Warren Co., 134 F.3d 1, 7 (1st Cir. 1998)). Where "the phrasing of the jury question" "suggested that the jury was putting it to the court to make the dispositive decision," we "cannot fault the court for choosing the more cautious alternative of re-reading the original instruction and letting that instruction stand alone." Id.

In this case, the district court simply directed the jury back to the earlier causation instructions to which the defendant had not objected. Among other things, these instructions explained that the jury should not award damages for an injury if it found "that the defendant has proven by a preponderance of the evidence that the injury or damage to the plaintiff was caused by a subsequent independent intervening event." Of course, we do not know exactly how the jury ultimately determined what damages were caused by Officer Gerrish's use of the Taser. Nonetheless, we see no basis for concluding that the ultimate damages figure was irrational.

Gerrish's main argument is simply that since Caldwell and Bernard were granted summary judgment for the cuffing, it is improper to allow Parker to recover for his shoulder injury. But this argument assumes the cuffing was the sole cause of the injury. Gerrish, however, did not seek or obtain summary judgment to that effect. Therefore, this causation question was properly a matter for the jury. See Napier v. F/V Deesie, Inc., 454 F.3d 61, 69 (1st Cir. 2006) ("The issues of foreseeability and superseding cause are properly for the jury to decide when there may be reasonable differences in opinion."). In its answer to the jury's question, the district court properly left the matter in the jury's hands by making clear that the jury should only award damages to Parker

where they determined Gerrish's use of the Taser was the legal cause of the injury.

Furthermore, we cannot conclude that the jury acted irrationally in assessing causation. Considering testimony that a Taser discharge causes involuntary muscle paralysis and uncontrolled falls, the jury might have concluded that the Taser, combined with the subsequent cuffing, was a proximate cause of any rotator cuff injuries. In other words, the jury might have found that the defendant did not meet his burden of showing an independent intervening event. That Parker testified he first felt shoulder pain during cuffing does not establish that the paralysis and fall did not contribute to the injury. Additionally, Parker's doctor gave his opinion that both injuries were the result of the "tasing incident." Gerrish did not call his own medical expert and has not pointed to any basis in the record which compels a finding that such a causation conclusion would be irrational.

Gerrish argued his position on causation to the jury, and the jury could reasonably have rejected his argument. In sum, we conclude that Gerrish was not entitled to have the district court rule out Gerrish as a cause of the shoulder injury.[3]

---

[3] Furthermore, it is even possible that the jury found that Gerrish was not responsible for the shoulder injury and awarded $111,000 just for the nerve damage. Parker described the pain inherent in being shot with a Taser and reported persistent numbness in his thumb. A medical expert confirmed nerve damage to Parker's arm and delivered an expert opinion that the Taser was the cause of that injury. We are unable to say, on this record, that

### III. Conclusion

For the foregoing reasons, we affirm the district court's denial of Gerrish's post-trial motions and the judgment in favor of Parker.

**Affirmed**.

---

$111,000 is an irrationally large award for such injury and pain.