**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0785n.06

**Case No. 14-3055**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 16, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MELISSA STANDIFER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| JACOB LACON; CITY OF FRANKLIN, | ) | SOUTHERN DISTRICT OF |
| OHIO, | ) | OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

**O P I N I O N**

BEFORE: DAUGHTREY, McKEAGUE, and WHITE, Circuit Judges.

**McKEAGUE, Circuit Judge.** On the night of May 7, 2010, Melissa Standifer needed help. When she began hallucinating about seeing blood everywhere, her mother called the police. Once the police arrived, Standifer descended into a "flat rage" and resisted the police officers' help. One officer handcuffed her and held her wrists so she could be safely taken to the hospital. As the officer walked her to the curb, she kicked him in the groin and ended up on the ground. The officer says she fell, but Standifer says that she was taken down by the officer. She fractured her neck in the process and sued, claiming that the officer unreasonably seized her in violation of the Fourth Amendment. We disagree and hold instead that the officer did not use excessive force. We thus affirm the district court's grant of summary judgment.

**I.**

In an appeal from a grant of summary judgment in a 42 U.S.C. § 1983 action, we adopt the plaintiff's version of the facts except when the record "blatantly contradict[s]" it "so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 378–80 (2007). The story below, therefore, is Standifer's except where the police dash-cam video—which depicts all of the genuinely disputed facts—refutes it. *See id.*

On May 7, 2010, Standifer took two Percocets before heading to a bar. At the bar, she drank four beers and ten to twelve shots of Jagermeister—in three hours. Around midnight, she called her estranged husband to drive her home. He did, dropping her off around 1:00 a.m. without going inside. She fell asleep on the couch.

Not quite two hours later, Standifer was awake and had called the police to report a disturbance occurring outside her home. Defendant Officer Jacob Lacon and one other officer arrived on scene, finding the front door wide open but no disturbance outside. The officers lawfully entered Standifer's house to ensure the reported disturbance had not moved inside. Upon entering, the officers discovered that Standifer was again asleep on the couch. The officers woke her, found her heavily intoxicated but calm, and left after confirming that everything was safe.

After they left, the now-awake Standifer called her mother, Carolyn Hipsher. The two began to fight over the phone. Standifer told her mother that she was drunk, had taken drugs, and needed her help. But then she hung up and would not answer her worried mother's calls. Hipsher sought the assistance of her other daughter (Standifer's sister), Maggie, who finally reached Standifer on her phone. Standifer cried to her sister, saying that she "didn't mean to do it," although she would not say what she "didn't mean to do." Upon hearing this, and knowing

Standifer's history of suicide attempts, Maggie became "extremely concerned" about her sister's safety. Maggie told her mother all of this, and Hipsher departed for Standifer's house.

Standifer called Maggie back, this time with more troubling news. Continuing to cry and to insist that she "didn't mean to do it," Standifer now added: "There's blood everywhere. I am so sorry Maggie; I didn't mean to do this." Maggie called her mother with this news, worrying that Standifer had hurt herself, her husband, or her children. Hipsher called 911 from her car, informing the dispatcher that Standifer claimed "there's blood everywhere" and that her daughter was "messed up on drugs or something."

Responding to the call, Lacon went back to Standifer's house. The dispatcher fully advised Lacon of the situation. Hipsher also informed Lacon that Standifer was suicidal and on drugs, and that if she was arrested, Standifer said that she would "do it right this time."

Standifer let Hipsher, Lacon, and another officer into her home. Inside, there was no blood, but Standifer "was at a flat rage." She screamed at her mother, recounting being raped by her stepfather without her mother stepping in. For nearly ten minutes, Standifer cried for someone to help her. Lacon stood by, taking this all in.

Given what he was told and what he observed, Lacon had probable cause to conclude that Standifer needed to go to the hospital for a psychiatric evaluation. *State v. Standifer*, No. CA2011–07–071, 2012 WL 2700454, at *3–4 (Ohio Ct. App. July 9, 2012) (holding so). Standifer rightly accepts this holding. *See Allen v. McCurry*, 449 U.S. 90, 97–98 (1980); *Hicks v. De La Cruz*, 369 N.E.2d 776, 777–78 (Ohio 1977). The police called an ambulance for Standifer in accordance with section 5122.10 of the Ohio Revised Code, which authorizes "[a]ny . . . police officer" to "take a person into custody" and "immediately transport" that person "to a hospital" when the police has probable cause that the person represents a risk to themselves.

Standifer refused Lacon's several offers to go to the hospital voluntarily, and so Lacon placed her in handcuffs to ensure her safety and compliance.

The situation escalated after Standifer was placed in handcuffs. As the two walked to the curb to wait for the ambulance, Standifer "obstruct[ed] official business" by "screaming, jerking, pulling away, and 'stutter stepping.'" *Standifer*, 2012 WL 2700454, at *6. And while still waiting for the ambulance, she kicked Lacon in the groin. This "assault" on Lacon, *id.* at *5, set the disputed event into motion: Standifer claims that Lacon pushed her to the ground, but Lacon claims that Standifer fell from losing her balance during the kick. Either way, both ended up on the ground, Standifer suffered a "hangman's fracture" that rendered her cervical spine unstable, and this section 1983 lawsuit ensued.

Standifer alleges that Lacon used excessive force in violation of the Fourth and Fourteenth Amendments and that the City of Franklin maintained an unconstitutional "handcuff-everyone" policy under Ohio Revised Code section 5122.10. The district court rejected her claims on the merits, granting summary judgment to Lacon and the City. Standifer timely appealed, and we now affirm.

**II.**

The State acts "unreasonabl[y]" when it uses excessive force to "seiz[e]" a "person[]." *See* U.S. CONST. amend. IV. This Fourth Amendment prohibition applies to cities and their officers through the Fourteenth Amendment in suits brought under 42 U.S.C. § 1983. Summary judgment for the defendants is proper when, on de novo review and after construing the facts most favorably towards Standifer, the defendants' actions were "objectively reasonable" under the Fourth Amendment. *Chappell v. City of Cleveland*, 585 F.3d 901, 909, 914 (6th Cir. 2009).

Standifer raises three specific claims of excessive force: (A) the handcuffing; (B) the handcuffing too tightly; and (C) the alleged "takedown." None rise to an unconstitutional level.

**A.**

Standifer first alleges that being handcuffing to go to the hospital was excessive force. To evaluate this claim, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). We do not use "the 20/20 vision of hindsight" but instead view the officer's actions from "the perspective of a reasonable officer on the scene," understanding that the police often have to make "split-second" decisions about how much force to use. *Id.* at 396–97. And we look objectively at the totality of the circumstances. *Id.* at 397.

Under this framework, it was objectively reasonable for Lacon to handcuff Standifer. Police officers may constitutionally handcuff someone as a "safety precaution," even when they are "merely detaining, but not arresting" the person. *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007); *see also* OHIO REV. CODE § 5122.10. That is what Lacon did here, as a precaution for himself, others, and, most importantly, Standifer herself. Lacon knew that he was dealing with someone who needed help. Standifer was seeing nonexistent "blood everywhere" and claiming that she "didn't mean to do it"; she recounted times her stepfather had sexually abused her; she was highly intoxicated; she screamed; and she refused opportunities to go to the hospital free of handcuffs. All this led an Ohio appellate court to hold that Lacon had probable cause to seize Standifer. *Standifer*, 2012 WL 2700454, at *5. Acting with this probable cause, Lacon did not unreasonably seize Standifer by handcuffing her.

Because Lacon did not violate the Fourth Amendment by handcuffing Standifer, there can be no *Monell* claim against the City. *Monell* claims require Standifer to prove first that she

suffered a deprivation of a constitutionally protected interest. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). But as we just held, Lacon's decision to handcuff her was constitutional under these facts, and thus Standifer cannot make out her claim against the City. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the [City's policy] might have *authorized* the use of constitutionally excessive force is quite beside the point."). We need not reach whether the City maintains a "handcuff-everyone" policy or whether it would violate the Constitution; as a matter of law, the City is not liable.

**B.**

Standifer next alleges that even if being handcuffed was reasonable, *the way* she was handcuffed was unreasonable. We have previously held that excessive-force claims can be maintained for handcuffing an individual's wrists too tightly. *See, e.g.*, *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993). "In order to reach a jury on this claim, the plaintiff [1] must allege some physical injury from the handcuffing, and [2] must show that officers ignored [her] complaints that the handcuffs were too tight." *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005) (internal citations omitted).

Standifer does not satisfy these requirements. First, her hangman's fracture stems from the alleged *takedown*, not from the *handcuffs*. And second, she admits that the handcuffs were too *loose*. *See* R. 57 at 174; Appellant Br. 18; Reply Br. 12 ("Lacon put Ms. Standifer in a set of handcuffs that were clearly too big for her wrists."). A reasonable officer accordingly would not have known that he needed to loosen the handcuffs. *See Lyons*, 417 F.3d at 575–76.

Standifer counters that she had minor bruising on her wrists, *cf. Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 403 (6th Cir. 2009), and that she repeatedly asked Lacon

"let go of [her] arm" because his tight grip pressed the handcuffs against her. Her tightness claim therefore boils down to an allegation that Lacon held her too tightly. But even assuming he did, he did not act unreasonably. Standifer admittedly tugged and pulled to free herself from the too-loose handcuffs. And she twisted, turned, and screamed. All this while Lacon knew she was heavily intoxicated, potentially suicidal, hallucinating, and threatening to "do it right" if she was arrested. Lacon did not need to let Standifer escape the handcuffs and run free; he could hold her wrists to secure the handcuffs—and everyone's safety. Because these facts do not show excessive force, summary judgment was proper.

No case on which Standifer relies changes this conclusion. *Walton*, for one, is inapposite because Standifer had no preexisting injuries, and she did not communicate that she was in any pain besides saying a generic "ow"—a consistent response *any time* handcuffs are placed on one's wrists. *Cf.* 995 F.2d at 1342 (the plaintiff "begged not to be handcuffed because of her injured shoulder"—soon after leaving her doctor's office for that injured shoulder). Ditto for *Morrison* because Standifer's handcuffs remained on her wrists for mere minutes, compared to Morrison's forty to fifty minutes of pain after being asked to loosen the handcuffs, *cf.* 583 F.3d at 401. Also unlike cases where summary judgment is improper, Standifer undisputedly resisted, which created an actual need for Lacon's tight grip. And Lacon gave Standifer the option to not be handcuffed at all—an option that Standifer refused several times. We must remember that "[n]ot all allegations of tight handcuffing . . . amount to excessive force." *Lyons*, 417 F.3d at 575. This is such a case.

## C.

Standifer finally alleges that Lacon performed an unconstitutional "takedown" on her after she kicked him in the groin. The district court disagreed, relying on the dash-cam video to

find that Standifer actually just lost her balance and fell after kicking Lacon. *Standifer v. Lacon*, No. 1:11-CV-00293, 2014 WL 198169, at *3 (S.D. Ohio Jan. 15, 2014). For us to affirm on this ground, the video would have to unequivocally show that Standifer merely fell and was not pushed down—so unequivocally, in fact, that any reasonable jury would *necessarily* conclude that Standifer fell down on her own. *See Scott*, 550 U.S. at 378–80.

The video is not so unequivocal. Rather, a reasonable jury could accept either side's story: Lacon may have pushed Standifer down; or she may have merely fallen. It matters not what *we* would conclude if we were jurors; it only matters that reasonable minds can differ. And they can. Thus, the video here, unlike the one in *Scott*, does not "utterly discredit[]" Standifer's side of the story, *id.* at 380, and the dispute over whether Standifer was in fact pushed down is not for us to decide. We must instead adopt Standifer's plausible version of the facts as we ordinarily do in this context, and, after doing so, we must assume that Lacon pushed her to the ground.

But a point Standifer seems to miss: "Not every push . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396. Standifer barely addresses this part of Lacon's argument. *See* Appellant Br. 27 (one sentence with a string citation); Reply Br. 12–14. Assuming arguendo that Standifer was pushed down, the question of whether Lacon's conduct was "objectively reasonable" *is* a pure question of law for us, as judges, to decide. *See Scott*, 550 U.S. at 381 n.8; *Dunn v. Matatall*, 549 F.3d 348, 353–55 (6th Cir. 2008). In answering this question, we pay close attention to "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [s]he is actively resisting arrest or attempting to evade arrest." *Graham*, 490 U.S. at 396–97.

Even if Lacon pushed Standifer to the ground, it was objectively reasonable to do so. Although serious injury resulted, the video shows that Lacon did not slam, shove, or throw Standifer to the ground; at most he guided her down by pulling her arms up and pushing the rest of her body down—a reasonable response after being kicked in the groin. More important than our assessment of the video, though, is that all three *Graham* considerations cut in Lacon's favor. *First*, Standifer had just committed the crimes of assaulting a police officer and obstructing official business. *Standifer*, 2012 WL 2700454, at *5–6. *Second*, the officers had probable cause to believe that she posed a danger to herself and others—even before she kicked Lacon—because of her intoxication, hallucinations, threats, and suicidal tendencies. *Id.* at *3–4. And *third*, Standifer admittedly attempted to evade going to the hospital—by actively twisting, turning, and kicking—obstructing official business in the process. *Id.* at *6. Knowing all of this and only *after* being assaulted, Lacon allegedly made a split-second decision to take Standifer to the ground. The Fourth Amendment "permits an officer to use reasonable force to protect himself from a reasonable threat," *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010), and that is what, at most, happened here. Because the alleged "takedown" was "objectively reasonable" under the facts plausibly construed in Standifer's favor, it is constitutional as a matter of law. *Accord Dunn*, 549 F.3d at 355; *Lee v. City of Norwalk*, 529 F. App'x 778, 782 (6th Cir. 2013); *Miller v. Cate*, 86 F. App'x 830, 831–34 (6th Cir. 2004). Summary judgment was accordingly proper.

No case that Standifer cites or that we found changes this conclusion. Her cases all deal with police "slamming" people—*even when they did not resist*. *E.g.*, *Cordell v. McKinney*, 759 F.3d 573, 576, 582 n.2 (6th Cir. 2014). This unreasonable slamming arose in less chaotic contexts with harsher police force. *See, e.g.*, *Bass v. Robinson*, 167 F.3d 1041, 1046 (6th Cir.

1999) ("[D]espite [plaintiff's] cooperation, Officer Robinson attacked him both verbally and physically[,] . . . put him in a 'headlock[,]' and slammed Plaintiff's head against a tree several times."). Here, Standifer never alleges that Lacon acted maliciously, and the video confirms as much. And here, Standifer "knowingly caused physical harm to Officer Lacon" by kicking him and purposely obstructed his official business by "screaming, jerking, pulling away, [] 'stutter stepping,'" and kicking. *Standifer*, 2012 WL 2700454, at *5–6. Thus, unlike some other Sixth Circuit cases, there are no "factual disputes" as to whether Standifer "posed a threat or actively resisted arrest," *e.g.*, *Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013)—she undisputedly did.

As a matter of law, none of Lacon's actions violated the Fourth or Fourteenth Amendments.

**III.**

What happened to Standifer is indeed unfortunate. She needed help to deal with serious issues in her past. And the officer who tried to get her this help contributed, at least in some way, to her neck fracture. But not all unfortunate events involving the police are constitutional violations. Lacon acted in an objectively reasonable way in response to legitimate threats— which the Fourth Amendment allows. Because his actions did not constitute excessive force under these facts, we AFFIRM the district court's grant of summary judgment as to both defendants.