RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SCOTT RUDLAFF, Personal Representative for the
Estate of Lawrence Carpenter,

*Plaintiff-Appellee,*

v.

BRANDON GILLISPIE; JACOB BIELSKI,

*Defendants-Appellants.*

No. 14-1712

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:12-cv-00844—Janet T. Neff, District Judge.

Argued: June 16, 2015

Decided and Filed: July 1, 2015

Before: McKEAGUE and DONALD, Circuit Judges; MATTICE, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Marcelyn A. Stepanski, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C.,
Farmington Hills, Michigan, for Appellants. David G. Blake, ROMANO LAW, P.L.L.C.,
Pleasant Ridge, Michigan, for Appellee. **ON BRIEF:** Marcelyn A. Stepanski, JOHNSON,
ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellants. Christina
D. Davis, ROMANO LAW, P.L.L.C., Pleasant Ridge, Michigan, for Appellee.

McKEAGUE, J., delivered the opinion of the court in which MATTICE, D.J., joined, and
DONALD, J., joined in the result. DONALD, J. (pp. 10–15), delivered a separate opinion
concurring in the judgment.

---

[*] The Honorable Harry S. Mattice, Jr., United States District Judge for the Eastern District of Tennessee,
sitting by designation.

1

_____

**OPINION**

_____

McKEAGUE, Circuit Judge.  Two county police officers used force (one, a knee strike; the other, a taser) to subdue Lawrence Carpenter during his arrest.  Their dash-cam videos show, and Carpenter admits, that he resisted arrest and refused to be handcuffed before the officers used force.  When an arrestee actively resists arrest like Carpenter did, the police can constitutionally use a taser or a knee strike to subdue him.  Because the officers did no more than that here, they acted within the bounds of the Fourth Amendment.  We accordingly reverse the district court's denial of summary judgment to the officers.

I

Before filling in the facts, let us be clear on how we view them.  Ordinarily in summary-judgment appeals involving qualified immunity (like this one), we view the facts in the light most favorable to the plaintiff.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  But there is "an added wrinkle in this case: existence in the record of [two] videotape[s] capturing the events in question."  *Id.*  In such a case—"where the police dash-cam video[s] . . . depict[] all of the genuinely disputed facts," *Standifer v. Lacon*, 587 F. App'x 919, 920 (6th Cir. 2014)—we "view[] the facts in the light depicted by the videotape[s]."  *Scott*, 550 U.S. at 381.

Here are the facts, then, according to the two dash-cam videos and filled in by the record taken in the plaintiff's favor.  As Deputy Brandon Gillispie drove along Route 55 in Wellston, Michigan on routine afternoon patrol, he observed Lawrence Carpenter's truck going the other way.  Gillispie knew Carpenter from three prior encounters, all involving Carpenter driving with a suspended license.  In the last of these encounters, Carpenter took off running after being pulled over by Gillispie.  Gillispie also knew Carpenter's history of drunk driving and getting physical with police officers after being stopped.  Thus, when Gillispie saw Carpenter driving on this occasion, he knew Carpenter was violating the law because he was (at least) driving with a suspended license, and he was on high alert because of Carpenter's history with the police.

Gillispie accordingly made a U-turn, turned on his lights, and pulled Carpenter over to arrest him—in an undisputed lawful stop. Gillispie called another officer, Deputy Jacob Bielski, for backup and informed Bielski of Carpenter's history of aggression toward the police. Bielski, who was only seconds away, pulled over behind Gillispie and Carpenter. The three cars parked on the narrow shoulder of the two-lane, 55-mile-per-hour highway. Both officers' dash-cam videos recorded the events that followed.

Gillispie approached Carpenter's truck and informed him through his open window that he was under arrest for driving with a suspended license. R. 28-1 (Carpenter Dep.) at 14. Gillispie then opened the driver's side door and told Carpenter to get out. According to Gillispie, Carpenter appeared "highly agitated" and was "swearing" in response to this request, but he voluntarily exited the truck. R. 28-2 (Gillispie Dep.) at 7. The videos and depositions confirm that Carpenter appeared agitated, as he puffed out his chest and stared down Gillispie as he left the vehicle. Gillispie instructed Carpenter to put his hands on the truck. But Carpenter did not listen to Gillispie's instructions. Gillispie then grabbed Carpenter's right arm and tried to move it onto the truck. Carpenter swung (or "jerked," if you'd prefer, Concurring Op. at 12–13) his arm back in Gillispie's direction—admittedly trying to "prevent [Gillispie] from handcuffing" him. R. 28-1 at 15.

After the swing, Gillispie succeeded in getting Carpenter to put both hands on the truck and attempted to grab Carpenter's left arm to place it in handcuffs. At this, Carpenter swung his arm in Gillispie's direction for the second time, again trying to resist being handcuffed. *See* R. 28-1 at 15. The audio in one of the dash-cam videos picked up Gillispie at least twice telling Carpenter to "give me the hands." R. 30 (Bielski Dash-Cam Video) at 13:13:46–50. But Carpenter still would not comply. He testified that he instead just "ball[ed] up" because Gillispie had "kept tugging on me," and that he would have complied if Gillispie would have let him go. R. 28-1 at 19.

Yet Gillispie did not let go, and Carpenter did not comply. Gillispie performed a knee strike on Carpenter, attempting to force his compliance. But the knee strike did not succeed in subduing Carpenter, who still appeared to be struggling. R. 30 (Gillispie Dash-Cam Video) at 13:17:43–51. Deputy Bielski, who had observed all of this—from the puffed-up chest, to the

two arm swings, to Carpenter's balling up, to the ineffective knee strike—yelled at Carpenter to "relax, or else you're gonna get tasered." R. 30 (Bielski Dash-Cam Video) at 13:13:50–51. (Bielski does not remember giving this warning, *see* R. 28-3 at 7, but it is clear from the video.) Carpenter testified that he didn't "pay [] attention" to this warning. R. 28-1 at 16. Moments later, Bielski tased Carpenter, who almost immediately fell to the ground. The officers handcuffed him, assisted him to his feet, and escorted him to the police cruiser. They did not use any force after they subdued Carpenter, who later pled guilty to driving with a suspended license.

Carpenter sued the officers, claiming they used excessive force in violation of the Fourth (and Fourteenth) Amendment. He contends that both Gillispie's knee strike and Bielski's taser shot were excessive, but his briefing treats the two types of force alike. We do the same. (Carpenter has since passed away from causes unrelated to this case. His estate's personal representative, Scott Rudlaff, has taken over the case, but we still refer to the plaintiff as Carpenter.) The officers, believing qualified immunity insulates them from this suit, sought summary judgment before the district court. But citing "disputed issues of material fact," the district court denied the motion, even though it noted that the "case do[es] not fall neatly into" categories of clearly established law. R. 32 at 1, 7, 9.

The officers appealed. We have jurisdiction to hear the appeal under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Contrary to Carpenter's contention, *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995), does not stand in the way because the officers do not "solely contest the plaintiff's account of the facts." *Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 607 (6th Cir. 2015). They accept the record taken in the videos' and plaintiff's light and raise a pure question of law: whether their conduct violated the Fourth Amendment and, if so, whether it violated clearly established law. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014); *see Scott*, 550 U.S. at 378–81.

## II

We begin with some general propositions of law. The police must act reasonably when seizing a person. *See* U.S. CONST. amends. IV & XIV. Using "excessive force" during an arrest is unreasonable and thus violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). But a police officer who uses excessive force can be held personally liable only

if the use of force was clearly established as excessive at the time of the arrest. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). That means existing caselaw must clearly and specifically hold that what the officer did—under the circumstances the officer did it—violated the Constitution. We therefore must determine (A) whether the officers' conduct violated the Constitution; and (B) if so, whether it violated law that has been clearly established.

A

*Prong One.* Our cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest. *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012); *e.g.*, *Williams v. Sandel*, 433 F. App'x 353, 363 (6th Cir. 2011) (not excessive force to tase the suspect *thirty-seven* times (and use batons and pepper spray) because he actively resisted arrest). Active resistance includes "physically struggling with, threatening, or disobeying officers." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (collecting cases). And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance. *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012); *see Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010). But active resistance does not include being "compliant or hav[ing] stopped resisting," *Hagans*, 695 F.3d at 509; or having "done nothing to resist arrest," or having "already [been] detained," *Cockrell*, 468 F. App'x at 496 (collecting cases). *E.g.*, *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (excessive force to tase someone whose "noncompliance was not paired with any signs of verbal hostility or physical resistance"); *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007) (excessive force for an officer who, if the plaintiff was believed, "almost immediately and without provocation" began choking the suspect). A simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.

Based on the record and law before us, the officers did not violate Carpenter's constitutional rights when they used force to subdue him. No matter how you cut it, Carpenter actively resisted arrest. There is no genuine dispute of fact on this point. Carpenter never denies being verbally defiant, and in fact admits that he "told [Deputy Gillispie that he] wasn't going

to" comply. R. 28-1 at 18. He puffed his chest and stared down Gillispie. He twice swung his arms in the officer's direction. He locked up his body ("ball[ed] up") and admittedly refused to give Gillispie his hands. And, pivotally, he admitted at his deposition that he tried to prevent Gillispie from handcuffing him—*i.e.*, *he conceded that he resisted arrest*. R. 28-1 at 15; *see* Oral Argument at 17:41–18:03. (And yes, words, including Carpenter's own words, *do* have power. Concurring Op. at 10.) A reasonable police officer observing this scene in the heat of the moment did not need to give Carpenter any more time to comply before tasing him. Because Carpenter "actively resist[ed] arrest and refus[ed] to be handcuffed," *Hagans*, 695 F.3d at 509, a reasonable jury applying the law of our circuit could conclude only that the officers were constitutionally able to use the force they did to subdue him. *Id.*

Carpenter's version of the facts does not change this conclusion. His story—that he was "jerked [] out of the truck," R. 28-1 at 15, and that he "attempt[ed] to comply with Gillispie's commands when Bielski deployed the taser without warning," Appellee Br. 16—amounts to a "visible fiction" in light of the dash-cam videos and his own admissions. *Scott*, 550 U.S. at 381. His purported subjective intent to comply with the officers' requests fares no better, for we view his actions *objectively*, from the perspective of a reasonable officer at the scene. *Chappell v. City Of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009). From that perspective, Carpenter "strongly indicated his intentions were not innocent and compliant, but defiant and hostile." *Id.*

The cases Carpenter cites also fail to change our conclusion. Simply, they do not involve suspects who actively resisted arrest. *E.g.*, *Correa v. Simone*, 528 F. App'x 531, 534 (6th Cir. 2013) ("[A]t the time [the officer] used the taser, [the suspect's] hands were in the air and he was not resisting."); *Landis v. Baker*, 297 F. App'x 453, 461 (6th Cir. 2008) (When the officers tased the suspect four times in a span of several seconds, they had already pinned him down by using "at least ten strikes of a police baton," even though "he was not actively resisting arrest or posing a threat to anyone in the vicinity."). Carpenter's self-proclaimed best case, *Parker v. Gerrish*, 547 F.3d 1 (1st Cir. 2008), is no different: The suspect there "complied with [the officer's] requests and gave himself up for arrest" by "voluntarily releas[ing] his hands" before the officers tased him. *Id.* at 9, 11. (It's also a First, not Sixth, Circuit case; the officer waived his qualified-immunity defense, *id.* at 13; the suspect did not initially know that he was under arrest; and the

court reviewed a jury verdict, not a motion for summary judgment.)    But even granting Carpenter's generous reading of *Parker*, Appellee Br. 18–22, we, no less these officers, follow the precedent from *this* circuit: that police officers can tase someone who resists lawful arrest and refuses to move his hands so the police can handcuff him.  *Hagans*, 695 F.3d at 509 (collecting cases).  That's all the officers did here.

Nor, finally, will we read a *de minimis* resistance exception into the Fourth Amendment, as Carpenter and the concurrence would have us do.  This exception would presumably prohibit the police from using force if a jury decided that the suspect only *kind of* resisted arrest.  *See* Concurring Op. at 13–14.  No, plain and simple:  When a person resists arrest—say, by swinging his arms in the officer's direction, balling up, and refusing to comply with verbal commands— the officers can use the amount of force necessary to ensure submission.  A *de minimus* rule— say, that the arrestee's arm swing needs to make direct contact with the officer, *see* Appellee Br. 16, Oral Argument at 19:06–19:08 (Carpenter's suggestion), or that the officers need to let the suspect resist for longer than thirty seconds before taking action (one minute?  Two?  *Three*?), *see id.* at 4:09–4:30 (the concurrence's suggestion)—does not provide the necessary guidance for the police, and it risks the safety of all involved.  Plus, this *de minimus* rule does not align with our caselaw, which has allowed force when the arrestee resisted less than Carpenter did here. *E.g.*, *Caie*, 485 F. App'x at 96–97 (force allowed because the arrestee did not give up his hands for arrest, even though he was taken down and "arguably 'subdued'").  Mindful as we are that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments [] in circumstances that are tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 396–97, we hold that because Carpenter actively resisted arrest, the one-time taser shot and knee strike to subdue him did not violate the Fourth Amendment.

B

*Prong Two*.  Now assume we got it completely wrong.  On the constitutional point (prong one), assume Carpenter gets it right:  The officers violated the Fourth Amendment because Carpenter did not resist *enough* to justify the knee strike or the one-time use of a taser.  We would still have to reverse.  *Accord* Concurring Op. at 14–15.

Remember that qualified immunity (as we've been reminded again and again) is an "exacting standard" that gives officers lots of leeway, requiring their conduct to violate clearly established law to defeat the defense. *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *see also Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). Existing caselaw, in other words, must put the precise question "beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Where's the clearly established law here? Neither Carpenter nor the district court has an answer.

*Carpenter*. All Carpenter can muster are the cases cited above—the ones where the suspect either did not resist arrest or had stopped resisting before being tased. *E.g.*, *Parker*, 547 F.3d at 9, 11. Obviously those cases do not, as they must for Carpenter to prevail, clearly establish the opposite proposition: that the police may *not* use force on an arrestee who resists arrest. That may be why Carpenter conceded at oral argument that that the police *can* use force when someone resists arrest, and that this case does not fall within categories of clearly established law. Oral Argument at 20:58–21:33. And even if we created the *de minimus* exception Carpenter wants, our holding would not overcome the officers' qualified immunity here; it would apply against individual officers only in *future* cases.

*The district court*. The district court wrote that "this case do[es] not fall neatly into the[] categories" of clearly established taser law. R. 32 at 7. That's a concession that it could find no clearly established constitutional violation, and the court should have stopped there—and held for the defendants. In fact, we have done the same in an excessive-force case that "does not fit cleanly within" our taser case law, *Cockrell*, 468 F. App'x at 496–98, because qualified immunity operates in the "hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *see Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). When in such a haze—as the district court said it was in here—the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight. *al-Kidd*, 131 S. Ct. at 2083; *see Brosseau v. Haugen*, 543 U.S. 194, 201 (2004). The court erred in holding otherwise.

* * *

Carpenter conceded that he resisted arrest.  The videos show the same.  And the law says that when someone resists arrest, the police may constitutionally use force to ensure their compliance.  A jury has nothing left to decide.  Because the officers acted constitutionally—and because even if they didn't, by all accounts they didn't *clearly* act unconstitutionally—they are protected by qualified immunity.  We reverse.

---

**CONCURRENCE IN THE JUDGMENT**

---

BERNICE BOUIE DONALD, Circuit Judge, concurring only in the judgment. I concur in the majority's characterization of the legal standard and the circumstances under which qualified immunity is appropriate. That determination is driven by the facts. The majority uses words to evoke a scenario that would satisfy the first prong of the qualified-immunity standard. Indeed, words have power. In my view, the facts in this case—properly construed in Lawrence Carpenter's favor—did not justify the level of force employed by the officers. However, in light of the Supreme Court's recent heightening of the second prong of the qualified-immunity standard, I agree with the majority that the officers in this case are entitled to qualified immunity. Because I would hold that the officers' nearly immediate resort to the use of a taser constituted excessive force, I concur only in the judgment.

I.

At the summary-judgment stage, we must view the evidence in the light most favorable to the non-moving party. *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014). That principle applies with equal force to the dash-cam videos at issue in this case. The majority asserts that we must "'view[] the facts in the light depicted by the videotape[s].'" Maj. Op. at 2 (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)). In my view, the majority overreads *Scott*, which stands only for the proposition that a court need not accept a plaintiff's version of the facts if it is "blatantly contradicted by [a videotape], so that no reasonable jury could believe it." 550 U.S. at 380. In other words, only where an "unambiguous video recording" indicates that there is no triable issue, *Shreve*, 743 F.3d at 132, should the traditional weighing of inferences in favor of the non-moving party give way to video evidence. *See id.* at 143 (Clay, J., dissenting) (arguing that a panel must accept the non-moving party's interpretation of a video where "a reasonable jury could believe [the non-moving party] after viewing the video in evidence"). With this in mind, a brief summary of the facts follows.

II.

On the afternoon of February 8, 2010, as Deputy Brandon Gillispie drove eastbound on Route 55 in Wellston, Michigan, he observed a person, known to him as Lawrence Carpenter, driving a truck going the opposite direction. Based on a prior encounter, Gillispie surmised that Carpenter was driving on a suspended license. Gillispie made a U-turn, activated his blue lights, and pulled Carpenter over. The relevant encounter captured by Gillispie's dash-cam video—from the time Gillispie approached Carpenter's vehicle until the time Carpenter was tasered—lasted for a total of approximately 26 seconds. *See* R. 30 (Gillispie Dash-Cam Video) at 13:17:25-13:17:51.

Gillispie approached the subject vehicle and told Carpenter that he was under arrest for driving on a suspended license. Gillispie immediately opened the driver's-side door of Carpenter's truck and ordered him to exit the vehicle. *Id.* at 13:17:25. Carpenter complied.[1] *Id.* at 13:17:33. Gillispie testified that he then instructed Carpenter to place his hands on the bed of the truck, but that Carpenter refused. R. 28-1 (Gillispie Dep.) at PageID 150. According to Gillispie, Carpenter "didn't verbally refuse[,] . . . . but he refused to comply and put both hands on the back of the truck as I asked him to do." *Id.* Carpenter's testimony tells a slightly different story. According to Carpenter, "[Gillispie] tried to turn me around and lean up against the truck and wanted me to put my hands behind my back . . . ." R. 28-1 (Carpenter Dep.) at PageID 137. Gillispie's dash-cam video, which did not capture an audio recording of the exchange between Carpenter and Gillispie, does not confirm the veracity of either party's version of this portion of the encounter. Of note, it does not confirm that Gillispie informed Carpenter to place his hands on the bed of the truck, or, as the majority contends, that "Carpenter did not listen." Maj. Op. at 3. Moreover, although the majority readily accepts Gillispie's testimony on this point as true, the video does not confirm that "Carpenter appeared 'highly agitated' and was 'swearing' in response to this request." *Id.*

In any event, the video captures Gillispie grabbing Carpenter's right arm as Carpenter gripped the bed of his truck with his left arm. R. 30 (Gillispie Dash-Cam Video) at 13:17:36-

---

[1]Although Carpenter testified that Gillispie "jerked" him out of the truck, the video evidence contradicts that portion of his testimony. *Compare* R. 28-1 (Carpenter Dep.) at PageID 137, *with* R. 30 (Gillispie Dash-Cam Video) at 13:17:33. Accordingly, we need not accept it as true. *Scott*, 550 U.S. at 380.

13:17:38.  Carpenter jerked his right arm away from Gillispie's grip.[2]  *Id.*  Gillispie ultimately was able to get both of Carpenter's hands on the bed of the truck, *id.* at 13:17:40, to which Carpenter "hung on."  R. 28-1 (Carpenter Dep.) at PageID 141.  According to Carpenter, "[Gillispie] said, Well, put your arm behind your back, and I told him I wasn't going to.  I said, Just let me go and I will take my time and I will do it, but he wouldn't do it . . . ."  *Id.*  As Gillispie continued to grip Carpenter's arms, Carpenter jerked his left arm away and continued to grasp the bed of his truck.  R. 30 (Gillispie Dash-Cam Video) at 13:17:44.

The dash-cam video of another responding officer, Deputy Jacob Bielski, captured audio of this latter portion of the encounter.  *See* R. 30 (Bielski Dash-Cam Video).  Gillispie twice said to Carpenter, "give me the hands now."  *Id.* at 13:13:46-13:13:49.  When Carpenter refused to let go of the bed of his truck, Gillispie delivered a knee strike to Carpenter's left knee.  R. 30 (Gillispie Dash-Cam Video) at 13:17:49.  Bielski said, "relax, or you're gonna get tasered."  R. 30 (Bielski Dash-Cam Video) at 13:13:50-13:13:52.  One second later, Bielski said, "taser, taser, taser," *id.* at 13:13:53, and instantaneously shot Carpenter with his taser one time.  R. 28-3 (Bielski Dep.) at PageID 165; R. 30 (Gillispie Dash-Cam Video) at 13:17:50.  Carpenter then slumped onto the ground, where Gillispie was able to place him in handcuffs.  R. 30 (Gillispie Dash-Cam Video) at 13:17:50-13:18:16.  The officers then helped Carpenter to his feet and placed him in the back of Gillispie's cruiser.  *Id.* at 13:18:55-13:19:30.  Again, the relevant encounter in this case lasted less than 30 seconds.

III.

The majority's statement of the law regarding excessive force in the context of the use of tasers is accurate.  Courts review excessive-force claims on a case-by-case basis and consider the totality of the circumstances in each particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  We have held that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the

---

[2]The majority characterizes Carpenter's motion as a "sw[i]ng . . . in Gillispie's direction."  Maj. Op. at 3. A jury watching the video could reasonably conclude that the motion was far more benign.

Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). We also have held that non-compliance does not constitute active resistance unless it is paired with other active signs of resistance, such as verbal hostility. *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013); *Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009).

The problem here is the majority's *application* of the correct legal standard, which relies on factual inferences impermissibly drawn in the *officers'* favor. For example, in concluding that Carpenter actively resisted arrest "[n]o matter how you cut it," the majority asserts that Carpenter was "verbally defiant." Maj. Op. at 5. But that fact is plucked straight out of Gillispie's deposition testimony and is not confirmed anywhere else in the record. *See id.* at 3 (citing R. 28-2 (Gillispie Dep.) at PageID 149). Similarly, the majority emphasizes that Carpenter "twice swung his arms in the officer's direction." *Id.* at 6. But this is merely two appellate judges' interpretation of the video; it would not be unreasonable for a *jury* to conclude that Carpenter simply jerked his arm away from Gillispie, rather than full-on "swinging" it in his direction. *See supra* at 12 n.2. The majority's conclusion that "a reasonable jury applying the law of our circuit could conclude *only*" that Carpenter actively resisted arrest, Maj. Op. at 6 (emphasis added), depends on the premise that Carpenter's "noncompliance was 'paired with [] signs of verbal hostility or physical resistance[.]'" *Id.* at 5 (quoting *Eldridge*, 533 F. App'x at 535). Because that premise rests on factual inferences impermissibly drawn from the opposing party's testimony and against the non-moving party, I would affirm the judgment of the district court.

A brief survey of our case law upholding taser stuns on resisting suspects—much of which the majority cites for support—demonstrates that Carpenter's case is distinguishable. Put simply, a jury could reasonably find that Carpenter's resistance to Gillispie was too de minimis to justify the level of force used.[3] In *Hagans*, officers confronted and tased a suspect who fled on foot, attempted to open the locked driver's-side door of a police cruiser, and, after officers

---

[3]Despite the majority's insistence to the contrary, Maj. Op. at 7, this panel's recognition that excessive force may be actionable where resistance is de minimis would not be a novel concept. Recent, published case law demonstrates as much. *See, e.g.*, *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (recognizing with approval a prior Sixth Circuit case holding "that the officers' force was far in excess of what the [plaintiff's] *minimal resistance* . . . justified" (citing *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 686-88 (6th Cir. 2006)) (emphasis added)).

had wrestled him to the ground, "locked his arms tightly under his body [to resist being handcuffed], kicking his feet and continuing to scream."  695 F.3d at 507.  In *Caie v. West Bloomfield Township*, officers encountered a highly intoxicated, suicidal suspect who threatened the officers and, upon their approach, "began to run while flailing his arms violently." 485 F. App'x 92, 94 (6th Cir. 2012).  Officers tased the suspect only after wrestling him to the ground and after repeated requests for him to remove his hands from underneath his body in order to be handcuffed.  *Id.*  In *Williams v. Sandel*, officers pepper sprayed and repeatedly tased—to little effect—a suspect who was high on ecstasy, jogging naked along an interstate, and struggling to escape from officers after they had successfully handcuffed only one of his arms. 433 F. App'x 353, 354-56 (6th Cir. 2011).  In *Williams v. Ingham*, officers tased a suspect who led them on a high-speed chase through a residential area, struggled with an officer attempting to remove him from his vehicle (breaking the officer's finger in the process), and refused to remove his hands from underneath his body after being wrestled to the ground.  373 F. App'x 542, 548 (6th Cir. 2010).  None of these cases is on all fours with Carpenter's far-less-dramatic behavior.[4] The officers' use of a taser on Carpenter in these circumstances constituted excessive force.

IV.

The second prong of the qualified-immunity inquiry, however, shields officers from trial unless they "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  In its recent pronouncements on qualified immunity, the Supreme Court arguably has heightened the standard to clarify that a right is clearly established if it is "sufficiently clear 'that *every* reasonable official would [have understood] that what he is doing violates that right.'"  *Id.* (alteration in original) (emphasis added) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2078 (2011)) (internal quotation marks omitted).  Prior case law merely required a right to be "sufficiently clear that *a* reasonable official would understand that what he is doing violates that right"—not *every* reasonable official.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added).  Nor was any identical case required to be on point: "officials can still be on notice that their conduct violates

---

[4]As Carpenter argues, a jury could reasonably conclude that, given the short duration of the encounter, "[Carpenter] did not have time to comply with [Gillispie's] order before [Bielski] used his Taser."  *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012).

established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Goodwin*, 781 F.3d at 325 ("[T]here need not be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional." (alteration in original) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)) (internal quotation marks omitted)). Now, however, the law at the time of the officers' conduct must have placed the constitutional question "beyond debate."[5] *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (quoting *al-Kidd*, 131 S. Ct. at 2083) (internal quotation marks omitted).

Here, as demonstrated by my disagreement with the majority regarding the constitutionality of the officers' use of a taser in this scenario, the constitutional question is not—as it must be—"beyond debate." *al-Kidd*, 131 S. Ct. at 2083. I would hold that the officers' practically immediate resort to the use of a taser in this 26-second encounter violated Carpenter's Fourth Amendment right to be free from the use of excessive force. But because the question is debatable, it cannot be said that the officers' mistaken belief in the justification of their actions signals that they are "plainly incompetent" or "knowing[] violat[ors of] the law." *Id.* at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotation marks omitted).

Accordingly, I concur only in the judgment.

---

[5]While the Supreme Court may have "virtually ignored" the "fair warning" standard set forth in *Hope* in its *al-Kidd* decision, *see* Karen Blum, Erwin Chemerinsky, & Martin A. Schwartz, *Qualified Immunity Developments: Not Much* Hope *Left for Plaintiffs*, 29 Touro L. Rev. 633, 654 (2013), it did not expressly overrule (or even mention) it. *See al-Kidd*, 131 S. Ct. at 2086-87 (Kennedy, J., concurring) (noting that the qualified-immunity standard "ensure[s] the officer has 'fair and clear warning' of what the Constitution requires." (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))). Lower courts have recognized this "puzzling" silence. *Morgan v. Swanson*, 659 F.3d 359, 373 (5th Cir. 2011) (en banc).