*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BESSIE JONES, Administratrix of the Estate of
Nathaniel Jeffrey Jones, et al.
        *Plaintiffs-Appellees*,

    *v.*

CITY OF CINCINNATI, et al.,

        *Defendants*,

GUY ABRAMS; JAMES PIKE; JOEHONNY
REESE; JAY JONSTONE; BARON OSTERMAN;
THOMAS SLADE, Police Officers, Cincinnati
Police Division, individually and in their
official capacities,

        *Defendants-Appellants*.

No. 11-4174

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:04-cv-616—Susan J. Dlott, Chief District Judge.

Argued: October 12, 2012

Decided and Filed: November 29, 2012[*]

Before: GIBBONS and COOK, Circuit Judges; ROSENTHAL, District Judge.[**]

_____

**COUNSEL**

**ARGUED:** Peter J. Stackpole, CITY OF CINCINNATI, Cincinnati, Ohio, for
Appellants. Randolph H Freking, FREKING & BETZ, LLC, Cincinnati, Ohio, for
Appellees. **ON BRIEF:** Peter J. Stackpole, CITY OF CINCINNATI, Cincinnati, Ohio,
for Appellants. Randolph H Freking, Tod J. Thompson, FREKING & BETZ, LLC,
Cincinnati, Ohio, for Appellees.

-----

[*] This decision was originally issued as an "unpublished decision" filed on November 29, 2012.
The court has now designated the opinion as one recommended for full-text publication.

[**] The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of
Texas, sitting by designation.

---

**OPINION**

---

COOK, Circuit Judge.  The survivors and estate of Nathaniel Jones, who died after struggling with six Cincinnati police officers, brought a § 1983 action against those officers, alleging Fourth and Fourteenth Amendment violations and Ohio tort claims. The district court denied the officers' motion for summary judgment seeking qualified immunity and state statutory immunity, leaving pending four claims:  (1) an excessive-force claim against two officers for repeated baton strikes and jabs prior to handcuffing Jones; (2) an excessive-force claim against one officer for refusing to remove Jones's handcuffs despite a firefighter's request; (3) a failure-to-provide-adequate-medical-care claim stemming from all six officers' delay in rolling Jones over; and (4) an Ohio wrongful death claim based on the foregoing conduct.  The officers challenge by interlocutory appeal the district court's denial.  Because the record demonstrates that the officers did not act objectively unreasonably, we REVERSE.

I.

A party may appeal a district court's denial of qualified immunity to the extent that the denial turns on legal issues. *Johnson v. Jones*, 515 U.S. 304, 310–12 (1995). On interlocutory appeal, we thus "take, as given, the facts that the district court assumed when it denied summary judgment." *Id.* at 319.  Where video evidence "blatantly contradict[s]" this version of events, however, we "view[] the facts in the light depicted by the videotape." *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 493 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380–82 (2007)).  In support of their motion for summary judgment, the officers submitted a video recording from one officer's in-car camera.  Because this video does not blatantly contradict the facts assumed by the district court, we adopt those facts and draw all inferences in the light most favorable to the non-moving party. *See Scott*, 550 U.S. at 381; *Johnson*, 515 U.S. at 319.  Under this standard, the record establishes the following.

Shortly before 6:00 a.m. on November 30, 2003, Cincinnati firefighters sought police assistance for a disorderly person at a restaurant parking lot. Officers James Pike and Baron Osterman arrived and spotted Jones marching, squatting, and shouting profanities outside. Both officers approached and spoke to Jones, who weighed 348 pounds and was 5 feet 11 inches tall. Pike radioed the dispatcher, reporting that Jones may be violent and require a mental health response team. Pike also requested a supervisor and turned on the video recording system ("MVR") in his patrol car. The MVR recorded the subsequent encounter, but Pike's car hood partially obstructed the view of Jones's and the officers' actions on the ground:

> 6:00:07–6:00:12 a.m.: Upon arrival, Pike tells Jones, "You gotta tell me what's going on." Jones responds, "Get this little nappy haired white boy redneck!"

> 6:00:13–6:00:17: Pike warns Jones three times to back up. Jones lunges at Pike and throws a punch at his head. Osterman arrives with his PR-24 baton ("baton") in hand.

> 6:00:28–6:00:35: Osterman tackles Jones. Jones, Pike, and Osterman fall to the ground in front of Pike's car. Pike stands up and draws his baton. The officers shout several times, "Put your hands behind your back!" Jones does not comply and struggles aggresively.

> 6:00:36–6:00:55: Pike starts jabbing and striking Jones with his baton. Pike and Osterman continue to jab and strike Jones with their batons while shouting, "Put your hands behind your back!"

> 6:00:40–6:00:59: Jones continues struggling. While getting to his knees, Jones grabs Osterman's neck [6:00:41] and reaches toward Osterman's waist area [6:00:46]. He also grabs Pike's baton for approximately six seconds [6:00:53–6:00:59].

6:01:00–6:01:11: Pike and Osterman continue to shout, "Put your hands behind your back!" Jones says, "No way, no way," and "I'll take all that. Give it to me." Officer Abrams arrives.

6:01:16–6:01:25: Jones cries "Mama!" several times. Officer Thomas Slade arrives and pepper-sprays Jones.

6:01:38: The jabs and strikes end. Pike, Osterman, Abrams, and Slade then try to handcuff Jones.

6:01:50–6:02:22: Officers Jay Johnstone and Joehonny Reese arrive. All six officers try to handcuff Jones. The audio captures Jones moaning.

6:02:23: Jones moans loudly and then falls silent.

6:02:32: Officer Slade asks, "How 'bout we roll him?"

6:02:22–6:02:54: Officers continue to handcuff Jones. Both arms are cuffed at 6:02:54 when an officer says, "There we go."

6:03:24–6:03:34: Officer Slade asks, "We have to get him rolled, don't we?" Pike bends down to look at Jones and voices that the firefighters should come over.

6:03:36–6:03:40: Officers start rolling Jones. He is on his back by 6:03:40.

6:03:45–6:04:00: Pike checks Jones's breathing. Another officer shouts "Fire!" to request firefighters. They then realize that the firefighters left the parking lot. Someone calls the dispatcher to request the firefighters' return.

6:04:02–6:04:14: Pike checks on Jones, calling "Sir, sir!" several times, but Jones does not respond. Pike comments, "The guy still has a pulse. But I don't see him breathing." Someone says, "Turn him on his side."

6:04:28–6:04:30: Dispatcher confirms officers' request for a rescue unit.

6:04:21–6:04:40: One officer rubs Jones's sternum area. Another officer observes that Jones has a pulse but is not breathing.

6:04:40–6:04:50: Someone orders the officers to turn Jones on his side, and they do so by 6:04:50.

6:05:38–6:05:47: Officers wave and shout at the firefighters to hurry up. One of them stands up, holding a white first-aid box in his hands.

6:05:50: Firefighters come to Jones's side and administer CPR.

6:07:53: The video ends.

Thirty-five minutes later, Jones was pronounced dead. The coroner attributed Jones's death to abnormal cardiac rhythms resulting from a violent struggle and positional asphyxia.

The district court denied qualified and statutory immunity on four claims. It held that the objective reasonableness of Pike's and Osterman's baton blows depends on "whether the jury accepts the view that Jones was resisting arrest or was struggling to get upright to breathe." [R. 150, Summ. J. Order at 24, ID #3588.] Because "Pike and Osterman repeatedly hit Jones with barely a pause in between strikes," a reasonable jury could conclude that "Jones did not have an opportunity to submit to their demands to put his hands behind his back." [*Id.*] The district court also found that a genuine issue of material fact existed regarding whether all six officers acted with deliberate indifference because "at least one officer . . . drew the inference from the facts that a risk of substantial harm existed even before Jones was handcuffed, saying 'How 'bout we roll him?'" [*Id.* at 35, ID #3599.] On review, we assume that (1) Jones started struggling to breathe at some point during the fifty-nine-second period of strikes and jabs, and (2) all six officers inferred that Jones had a serious medical need by 6:02:32 a.m., when Officer Slade first asked, "How 'bout we roll him?"

II.

A two-step inquiry steers decisions on a defendant's entitlement to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, did the officer's conduct violate the plaintiff's constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, was that right clearly established at the time of the incident? *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). A court need not address these steps sequentially. *Pearson*, 555 U.S. at 236.

A. Excessive Force

We analyze claims of excessive force during arrest under the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard encompasses "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). It "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

1. Baton Strikes and Jabs

Officers Pike and Osterman argue that under the rapidly evolving circumstances of that morning, they did not act objectively unreasonably in using their batons to strike and jab Jones. We agree. It was Jones—a very large individual—who initiated the physical struggle by lunging at Pike and swinging at his head, despite repeated warnings from Pike to back away. [MVR at 6:00:13–6:00:17.] Both officers repeatedly ordered Jones to put his hands behind his back, but he refused, responding instead, "No way, no way" and "I'll take all that. Give it to me." [MVR at 6:01:00–6:01:11.] At no time did Jones comply with the officers' orders. As Jones got to his knees, he also grabbed Osterman's neck [MVR at 6:00:41], reached toward Osterman's waist area [MVR at 6:00:46], and grabbed Pike's baton for almost six seconds [MVR at 6:00:53–6:00:59].

Significantly, Pike and Osterman directed all jabs and strikes to non-critical areas of Jones's body, such as the arms, torso, back, and legs. They did not hit his head, throat, neck, heart, or groin.

Jones's survivors argue that the reasonableness of Pike's and Osterman's blows depends on a disputed factual issue: when Jones ceased resisting arrest and started struggling to breathe. Even assuming that Jones started struggling to breathe during the fifty-nine-second period of strikes and jabs, we still conclude that the officers did not act objectively unreasonably. Under the rapidly evolving circumstances of that morning, an objectively reasonable officer could not have discerned whether Jones resisted in an attempt to breathe or in defiance of commands. "An officer should be entitled to qualified immunity if he made an objectively reasonable mistake as to the amount of force that was necessary under the circumstances with which he was faced." *Solomon v. Auburn Hills Police Dep't.*, 389 F.3d 167, 175 (6th Cir. 2004) (citation omitted).

    2. Refusal to Remove Handcuffs

Officer Abrams argues that his refusal to unhandcuff Jones despite a firefighter's request to do so was not objectively unreasonable. We agree. The video shows that approximately three minutes elapsed from the time when officers handcuffed Jones [MVR at 6:02:54] to when firefighters arrived by his side [MVR at 6:05:50]. Some time later, Firefighter Gregory Adams asked that Jones's handcuffs be removed.[1] An objectively reasonable officer—given the short time to transition from handcuffing Jones to understanding his medical condition—could have thought that Jones's breathing problems did not warrant the removal of his handcuffs. Abrams testified that he did not remove Jones's handcuffs because putting them on was difficult, and he did not know if Jones was feigning injury. Abrams and Pike also testified that after a physical struggle, officers usually leave on handcuffs until the suspect is in jail. Although courts eschew considering an officer's subjective intent when applying the objective reasonableness test, *see Graham*, 490 U.S. at 397, an officer's explanation of his

---

[1]The video does not capture Adams asking this question.

motivations inform a court's understanding about what an objectively reasonable officer would have done under such circumstances.

Moreover, nothing in the record suggests that Adams or any other firefighter told Abrams that CPR could not be performed while Jones was handcuffed. In fact, the firefighters performed CPR on a handcuffed Jones immediately after they arrived by his side. Adams testified that he asked only once for the handcuffs to be removed because "we had to go to work." [R. 79, Adams Dep. at 91, ID #755].[2] Without notice that performing CPR on a handcuffed person is ineffective or less effective, Abrams did not act objectively unreasonably in refusing to remove Jones's handcuffs. *Cf. Dudley v. Eden*, 49 F. Supp. 2d 581, 589 (N.D. Ohio 1999) ("There was no reason for [the officer] to believe that removal of [plaintiff's] handcuffs was necessary to avoid a substantial risk of harm. For example, the paramedic did not indicate that [plaintiff] would suffer additional harm if the handcuffs were not removed.").

Because Pike, Osterman, and Abrams's actions were not objectively unreasonable, we need not decide whether Jones's rights under these circumstances were clearly established at the time of the incident.

B. Failure to Provide Medical Care

Qualified immunity also shields the officers from the Fourteenth Amendment claim arising from a sixty-four-second delay in rolling Jones out of a prone position. To prevail on a claim for failure to provide medical care, Jones's survivors must show that the officers were "deliberately indifferent" to Jones's "sufficiently serious" medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994); *Spears v. Ruth*, 589 F.3d 249, 254–55 (6th Cir. 2009). Deliberate indifference requires that an officer (1) "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) "draw the inference," and (3) "act or fail to act in a manner

---

[2]The firefighters testified that performing CPR on a handcuffed person is possible, albeit more difficult, especially when the recipient is obese. [*See* R. 80, Harrison Dep. at 41, 45, ID ##772, 773; R. 79, Adams Dep. at 100, 102, ID #757; R. 81, Otten Dep. at 84–88, ID ##801–02.]

demonstrating 'reckless or callous indifference' toward the individual's rights." *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002) (internal citations omitted).

The officers concede that Jones developed a sufficiently serious medical need. We also assume that all six officers (1) were aware or could infer that Jones was at risk for positional asphyxia and (2) inferred that Jones was at risk by 6:02:32 a.m. when Officer Slade first asked, "How 'bout we roll him?"

Assuming these facts, we determine that the officers did not disregard Jones's substantial risk of positional asphyxia. By 6:03:34 (about one minute after Slade's question), the officers realized that Jones should be rolled and started rolling him. Six seconds later, the officers had Jones on his back. They also realized that the firefighters left and immediately called for a rescue unit. [MVR at 6:03:47–6:04:00.] During the two-minute wait for the firefighters, the officers checked Jones's breathing, monitored his pulse, rubbed his sternum area, turned him on his side, and retrieved a first-aid box. [MVR at 6:04:02–6:05:50.] The officers also shouted for the firefighters to hurry to Jones's side. [MVR at 6:05:38–6:05:41.] The officers' attempts to aid Jones undermine the claim that they deliberately disregarded Jones's substantial medical risk. Their actions distinctively differ from the officers' inaction in *Estate of Owensby v. City of Cincinnati*. 414 F.3d 596, 603 (6th Cir. 2005) (denying qualified immunity where the evidence demonstrated that officers, after beating a suspect, locked him in the back of a police cruiser, and observed him in significant physical distress, "yet made no attempt to summon or provide any medical care" until six minutes later, after greeting each other, preparing for their superiors' arrival, and adjusting their uniforms). Our conclusion on deliberate indifference obviates any need to determine the clearly established law at the time of the incident.

III.

The officers also claim immunity under Ohio Revised Code § 2744.03(A)(6) against the wrongful death claim. Section 2744.03(A)(6) provides immunity from suit to certain state employees when their activities concern governmental or proprietary functions, except where they act with a "malicious purpose, in bad faith, or in a wanton

or reckless manner." *Id.* § 2744.03(A)(6)(b).  "[R]ecklessness is a perverse disregard of a known risk" and requires that the actor "be conscious that his conduct will in all probability result in injury."  *O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008) (citations and quotation marks omitted).  As detailed in the qualified immunity context, Pike and Osterman did not act objectively unreasonably in striking and jabbing an aggressively resistant Jones before handcuffing him; Abrams did not act objectively unreasonably in refusing to unhandcuff Jones where firefighters did not voice that CPR on a handcuffed person could not be administered effectively; and no officer disregarded Jones's substantial medical risk.  Satisfying the objective reasonableness standard shields these officers under state statutory immunity as well.

IV.

For the foregoing reasons, we REVERSE the district court's denial of qualified immunity and Ohio statutory immunity.