NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0230n.06

No. 16-3826

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| EMILY J. EVANS, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Apr 19, 2017 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| PHIL PLUMMER, et al., | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| Defendants, | ) | DISTRICT OF OHIO |
| | ) | |
| ERIC WAYNE BANKS; THOMAS FEEHAN, | ) | |
| | ) | |
| Defendants-Appellants, | ) | |

BEFORE: MERRITT, KETHLEDGE, WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Montgomery County Sheriff's Office ("MCSO") sergeants Wayne Banks and Thomas Feehan appeal the denial of qualified immunity and state-law immunity in this suit arising out of injuries sustained by Plaintiff Emily Evans while being processed into the Montgomery County Jail.[1] As to Banks's qualified immunity appeal, we **DISMISS IN PART** and **AFFIRM IN PART;** we **REVERSE** the denial of qualified immunity to Feehan, **AFFIRM** the district court's denial of state-law immunity to both appellants, and **REMAND** for further proceedings consistent with this opinion.

---

[1] The district court granted summary judgment to Sheriff Phil Plummer and corrections officers Brandon Ort and Rachael Yetter (collectively with Banks and Feehan, "Defendants").

## I. BACKGROUND

### A. Evans's Arrest and Behavior Prior to Arrival at the Jail

At approximately 2:00 am on March 30, 2014, Ohio State Highway Patrol Trooper Carl Paulin arrested Evans for driving under the influence and possession of marijuana.[2] According to Paulin, Evans was "highly intoxicated" and "verbally combative." (R. 55, PID 1265.) After being told she was under arrest, Evans "kind of became squirmy" and "was jerking around." (*Id.* at 1264.) But Paulin "did not have any issues controlling her" and "[n]ever had to use force" on her. (*Id.* at 1264, 1268.)

Paulin further testified that after Evans was secured, he transported her to the Centreville police department to have her blood-alcohol content tested. On the way, Evans offered to perform oral sex on Paulin, urinated on herself, kicked and punched the seat, banged her head against the partition several times, and spat. According to Paulin, Evans "was back there just flipping out as I would generally call it." (*Id.* at 1274.) At the police station, Evans continued "act[ing] out." (*Id.*) She "took her socks off and was swinging them around the room and holding them up in [Paulin's] face trying to get [him] to smell her urine." (*Id.* at 1264.) Her blood alcohol content was .210. Paulin decided "it was probably best for [Evans] to sit downtown and sober up for her safety . . . ." (*Id.* at 1267.) He therefore transported her to the Montgomery County Jail.

### B. Events at the Jail

Pursuant to standard procedure, when Paulin and Evans arrived at the jail, Paulin was asked whether Evans was "cooperative or uncooperative." (R. 55, PID 1267.) Paulin answered

---

[2] A small amount of marijuana was found in Evans's vehicle. There is no evidence Evans had used marijuana that night.

that Evans was uncooperative. Banks later reported that "Paulin advised us that Evans was highly intoxicated and had assaulted officers." (R. 55-3, PID 1298.) Paulin testified that he had a brief conversation with jail personnel, but denied that he ever told them that Evans had assaulted an officer. Paulin did tell jail personnel that Evans "spat," "urinated," and "slung her urine around." (R. 55, PID 1270.) At his deposition, Paulin acknowledged that jail personnel might have "assumed that that was assault," because, "technically . . . slinging the urine around the room" at the police department "could be an assault on an officer." (*Id.* at 1270, 1273.)

Every moment of Evans's time at the jail was recorded on video, often from multiple angles. The video shows Evans exiting Paulin's cruiser voluntarily, with her hands cuffed behind her. Banks and Yetter escort her into the receiving area of the jail, each holding one of her arms. As they enter the receiving area, Evans begins to complain, and Yetter responds: "Stop pulling away or it's gonna get a lot worse." (Handheld Camera Video Recording, R. 76 at 00:20 [hereinafter HandCam].) Yetter and Banks hold Evans against the wall of the receiving room, with her head against a padded mat and her hands still cuffed behind her. As Yetter begins to search Evans, Banks extends her cuffed hands and arms up and back, away from her body. Feehan, standing a few feet away, says: "Do what they tell you, or I'll tase you, you understand that?" (Receiving Room Camera 3, R. 76 at 4:53:22 [hereinafter Cam3].) Feehan continues: "Have you ever been tased before? It hurts." (*Id.* at 4:53:25.) Evans says: "Yes. For fun." (*Id.* at 4:53:28.) Feehan responds: "Well, this one won't be for fun." (*Id.* at 4:53:30.)

Meanwhile, Yetter continues to search Evans, and Banks says: "Stop pinching," although what prompts him to do so is unclear. (*Id.* at 4:53:32.) Feehan removes the belt of Evans's coat. Ort is attempting to remove a ring from Evans's hand, and Evans says: "Stop . . . my finger . . . ouch!" (*Id.* at 4:53:42.) Feehan tells Evans: "Stop resisting and do what they tell

you to do." (*Id.* at 4:53:45.) Evans answers: "I'm not resisting . . . You don't need to hurt me." (*Id.* at 4:53:47.) Another officer (it is not clear who) says: "Well then just hold still and relax." (*Id.* at 4:54:04.) Evans answers: "I am." (*Id.* at 4:54:06.) Feehan then instructs Evans to face the mat on the wall, and she does so.

As the search proceeds, Yetter is having trouble unbuttoning Evans's coat, and Evans asks her: "Do you need assistance?" (HandCam at 1:25.) Banks appears to pull Evans back a bit, and Feehan tells Evans: "Stop." (*Id.*) Evans turns to Feehan and responds: "I'm helping her . . . don't be assholes!" (*Id.* at 1:30.) As Yetter tries to get the coat open, Evans jerks her arms, though whether she does so on her own or in response to additional pressure applied by Banks is unclear. Evans then yells: "It fucking hurts!" (*Id.* at 1:40.) She begins to struggle a bit, and Banks tells her: "I'm gonna hold on to you until this is over. You're not gonna let go. I'm much stronger than you." (*Id.*) Evans sobs, and yells: "It hurts. I'm not resisting anything!" (*Id.* at 1:47.) Banks appears to be exerting pressure to hold Evans in place, and he tells her: "Stop." (*Id.* at 1:50.) Evans cries out multiple times. Feehan says: "Do what they say," and an officer (it is not clear who) adds: "It'll go much easier for you." (Cam3 at 4:54:44.) Feehan then lifts his taser and activates the laser sight. Feehan points the taser at Evans's face and the mat on the wall, and the dot from the laser sight is clearly visible on Evans's face. Feehan and Banks tell Evans to turn and face the mat. Evans does so, Feehan lowers the taser, and Evans yells: "Ouch! Honestly, fucking ouch! This hurts! I'm not resisting anything . . . . You're hurting me." (*Id.* at 4:54:50) Evans continues to complain, and eventually turns her head, prompting Feehan to point the taser at her again and say: "Face the mat, please." (*Id.* at 4:55:10.) Evans does so.

Evans quickly resumes moving her head around, however, and Yetter and Banks instruct her again to put her head against the wall mat; Evans complains, but eventually complies. Shortly thereafter, however, Banks tells her: "Stop moving around. You're making it worse." (*Id.* at 4:55:44.) Banks then tells Evans several times: "Let your arms relax." (*Id.* at 4:55:55.) Eventually, Yetter completes her task, and the officers prepare to remove Evans's boots and socks.

To that end, Banks instructs Evans to kneel on a bench set against the wall of the receiving room, and guides her to it, still holding her by her handcuffed arms. Evans does as instructed, kneeling with both knees on the bench and her face against the wall. Yetter removes Evans's boots as Ort holds Evans from the left and Banks holds her from the right. As Yetter does so, Banks tells Evans: "Do not kick your feet," although it is not clear whether Evans has done so. (*Id.* at 4:56:12)

Yetter then begins to tug on Evans's socks. Evans calls out: "Oh my god! Are you fucking serious!" and appears to slip from the bench and onto the floor. (*Id.* at 4:56:16.) What happens in the next few seconds goes to the heart of Evans's claim against Banks. First, Evans returns to the bench. It is not clear whether this is the result of her own actions, she is lifted by Banks, or Ort, or some combination of all three. Second, as Yetter tries to get hold of Evans's legs, Evans yells: "Ow! Oh my god!" (*Id.* at 4:56:21.) Third, Evans rises up on the bench and pivots to the right, separating from Ort but still being held by Banks. Again, it is not clear whether this is Evans's doing, or Banks's. Fourth, with Banks still holding her arms, Evans travels through the air in an arc, grazes the mat on the wall with her head, and hits the floor face first.

Evans is motionless immediately after the fall. Banks continues to hold her handcuffed arms, and Feehan says: "Now lay there." (*Id.* at 4:56:24.) As one officer removes a mat from the wall and places it on the floor, Banks asks: "Are you done resisting? Are you done?" (*Id.* at 4:56:31.) Banks then lifts an apparently nonresponsive Evans and places her head onto the mat. A medic arrives shortly thereafter and begins to examine Evans, who is eventually transported to the hospital.

## C. Defendants' Version of Events

In his Use of Force Report, Banks checked boxes indicating that Evans had "Ignored Verbal Directions / Passively Resisted," "Displayed Physical Danger Cues," was a "Safety Risk to Self / Others," and "Attempted Harm to Self, Others, or Property." (R. 49-4, PID 365.) In his incident report, Banks wrote:

> Evans . . . stood up on the bench and kicked at officers. While standing, Evans forcefully pushed off the wall with her right foot causing her body weight to fall in my direction. While continuing to hold onto her right arm, I turned my body to prevent her from landing on me and guided her mid-section to the ground. Evans['s] head struck the floor when she landed on the ground.

(R. 49-4, PID 362.) The other officers' reports were consistent with this narrative. Similarly, each Defendant who was deposed testified that Banks did not use excessive force and Evans's injuries were self-inflicted.

Feehan, however, acknowledged at his deposition that pointing his taser at Evans's head was a violation of MCSO policy, and that he had been disciplined for doing so.

## D. Evans's Injuries

Evans asserts that as a result of being unnecessarily thrown to the floor of the receiving room, she suffered "a life threatening subarachnoid hemorrhage above her right eye, multiple facial fractures including a non-displaced maxillary fracture in the right orbital area, and

fractured wisdom teeth which later needed to be surgically removed." (R. 1, PID 5.) At her deposition, Evans discussed those injuries, and also testified that the incident caused "[c]onsistent headaches developing into migraines, memory loss, inability to concentrate," and "blurred vision," as well as "racing thoughts," and "obsessive thoughts." (R. 53, PID 1154–55.) She also asserts an entitlement to compensation for the "pain of the handcuffs," though she admits she "do[es] not remember being in pain from the handcuffs." (*Id.* at 1188.)

## II. PROCEDURAL HISTORY

Evans filed this suit on September 8, 2014, alleging excessive-force claims against Banks, Feehan, Ort, and Yetter pursuant to 42 U.S.C. § 1983, a *Monell* claim against Plummer, a state-law battery claim against Banks, and a state-law assault claim against Feehan.[3] Defendants moved for summary judgment, arguing, among other things, that Banks, Feehan, Ort, and Yetter were protected by qualified immunity and Ohio's state-law immunity doctrine. The district court granted summary judgment to Plummer, Ort, and Yetter, finding that Ort and Yetter had used, at most, de minimis force, and that Evans had not made out a valid claim against Plummer under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The district court denied summary judgment to Banks and Feehan on both the excessive-force and state-law claims, finding both qualified immunity and state-law immunity inapplicable.

As to Banks, the district court summarized the video evidence as first showing him "escorting Evans, holding her by her handcuffs and applying pressure to her upper right arm and continuing to pull on Evans's handcuffs, pinching her wrists and push[ing] Evans's elbow

---

[3] A state-law defamation claim against all Defendants was voluntarily dismissed with prejudice and is not at issue on appeal.

forward in hyperextension," not stopping despite Evans "continually . . . informing him that her arms and wrists were in pain." (R. 77, PID 2328.) Further, according to the district court,

> [a] reasonable juror could . . . conclude that video footage shows Banks forcefully picked up Evans from the bench by her wrists and right arm. He then pivots to his right, raises her in the air, looks to spot where he is throwing her and slams her head-first onto the concrete floor, knocking her unconscious.

(*Id.* at 2330 (record citations omitted).) The district court also cited the deposition testimony of Michael Lyman, Evans's expert, who opined that the video shows Banks intentionally slamming Evans to the floor.

As to Feehan, the district court summarized the video evidence as showing Feehan "point[ing] the flashlight of his [t]aser directly at" Evans while "ordering her to face forward" into the wall mat. (R. 77, PID 2329–30.) The district court noted that Feehan "was disciplined for his use of the taser" by the MCSO, and held that "[a] jury could reasonably conclude that Feehan intended to maliciously inflict gratuitous fear when he aimed his taser directly at Evans's head." (*Id.* at 2333–34.) Citing out-of-circuit district court opinions, the district court held that this would constitute the use of excessive force, and therefore denied qualified immunity.

The district court also found that the video evidence created a fact question regarding whether Banks's and Feehan's conduct was reckless, making them ineligible for summary judgment based on state-law immunity.

Banks and Feehan filed this timely interlocutory appeal challenging the denial of qualified immunity and state-law immunity.

## III. FEDERAL CLAIMS

### A. Jurisdiction and Standard of Review

On interlocutory appeal of the denial of summary judgment based on qualified immunity in a case where all of the relevant events were captured on video, we accept the district court's

view of the facts unless it is blatantly contradicted by the video evidence. *Jones v. City of Cincinnati*, 736 F.3d 688, 692–93 (6th Cir. 2012) (citations omitted). We have jurisdiction only to the extent the defendant "limit[s] his argument to questions of law premised on facts taken in the light most favorable to the plaintiff." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 538 (6th Cir. 2008) (citation omitted). We review the denial of qualified immunity de novo. *Id.*

### B. Excessive-Force Claims and Qualified Immunity

We apply the Fourth Amendment's "objective reasonableness" test to allegations that government officials used excessive force during the booking process, not the Fourteenth Amendment's "shocks the conscience" test or the Eighth Amendment's "cruel and unusual punishment" test. *Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013). The Supreme Court recently approved of this approach by "adopt[ing] a bright line rule that 'a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.'" *Morabito v. Holmes*, 628 F. App'x 353, 357 (6th Cir. 2015) (quoting *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). In assessing objective reasonableness, we look "to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess*, 735 F.3d at 472; *see Kingsley*, 135 S. Ct. at 2475–76 (rejecting a subjective standard).

"The qualified immunity doctrine 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 320–21 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Courts ask two questions: (1) whether the plaintiff's federally-protected rights were violated, and (2) whether those rights were clearly established at the time. *Id.* "These questions may be

answered in either order; if either one is answered in the negative, then qualified immunity protects the officer from civil damages." *Id.* (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). In the excessive-force context, the law is "clearly established" only if the plaintiff "identif[ies] a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

## C. Banks

Evans brings two excessive-force claims against Banks: (1) Banks "hyperextend[ed] her right arm" and "constantly pull[ed] on and pinch[ed] her wrists with the handcuffs;" and (2) Banks "intentionally body slam[med] her head and face" to the floor. (R. 1, PID 7.)

### 1. The Handcuffs-Related Claim

Banks asserts that "the District Court did not address" Evans's handcuffs-based claim and that "[t]here is no objective evidence in the record to suggest Evans was injured by her handcuffs." (Appellants' Br. at 7.) The district court addressed the claim and found that the video evidence shows "Banks . . . pull[ing] on Evans's handcuffs, pinching her wrists and push[ing] Evans's elbow forward in hypertension," with Evans "heard continually asking Banks to stop and informing him that her arms and wrists were in pain." (R. 77, PID 2328 (record citation omitted).) This interpretation is not "blatantly contradict[ed]" by the video evidence— indeed, it is entirely reasonable—so we are bound by it. *Jones*, 736 F.3d at 692–93. On those facts, we agree with the district court that, "[g]iven Evans' profane protestations, a reasonable juror could conclude that Defendants"—most obviously Banks—"continued to inflict unreasonable pain on her." (R. 77, PID 2329.) Further, the unreasonable infliction of "intense physical pain" is sufficient to give rise to an excessive-force claim; there is no requirement that

the excessive force cause a permanent or visible injury. *See Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1048 (6th Cir. 1996).

Banks attacks the district court's interpretation of the evidence and argues that the video can only be interpreted to show that Evans was resisting Banks, such as by "tightening her arms and extending her hands, in active defiance of Banks' instruction to relax her arms." (*E.g.*, Reply Br. at 13.) Banks supports this argument by advancing his own interpretation of two still images drawn from the video. However plausible Banks's interpretation may be, it conflicts with Evans's version of events and with the district court's conclusion as to how a reasonable jury could interpret the video. Because Banks has not conceded the facts or presented any issue of law as to the merits of the handcuffs-related claim, we dismiss this component of the appeal for lack of jurisdiction. *Phillips*, 534 F.3d at 538.

## 2.    The Take-Down Claim

Evans's second claim against Banks is that he used excessive force by lifting her from the bench and slamming her to the floor. The district court found that the video evidence could reasonably be interpreted as showing Evans trying to regain her balance on the bench, followed by "Banks forcefully pick[ing] up Evans from the bench by her wrists and right arm," and then "throwing her and slam[ming] her head-first onto the concrete floor, knocking her unconscious." (R. 77, PID 2330 (record citation omitted).) Banks argues that the district court misinterpreted, mischaracterized, or overlooked aspects of the video evidence. According to Banks, "Evans kicked at Yetter and escaped her grasp," then "pushed herself off the wall and fell to the right of Banks." (Appellants' Br. at 8, 10.) Banks emphasizes the split-second nature of what happened, and cites the testimony of Samuel Faulkner, Defendants' expert, who opined that Banks did not lift Evans and throw her to the floor. A jury may eventually find Banks's arguments persuasive,

but the district court's interpretation is reasonable, appropriate at the summary judgment stage, and not "blatantly contradict[ed]" by the video evidence. *Jones*, 736 F.3d at 692–93. Banks may not raise this entirely factual dispute in an interlocutory appeal, and we dismiss this component of the appeal for lack of jurisdiction. *Jones*, 736 F.3d at 692–93.

Banks does raise one question of law—whether the relevant law was clearly established. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1990) (en banc). It was. In this circuit, it has been clear since before this case arose that the Fourth Amendment's objective reasonableness standard applies to the use of force against detainees during the booking process. *Burgess*, 735 F.3d at 473–74.

Further, Evans does not rely on cases that merely "lay out excessive-force principles at only a general level." *White*, 137 S. Ct. at 551. *Burgess* was decided approximately five months before the events at issue here. The facts, viewed in Burgess's favor, were that Burgess was taken to the ground during the booking process because he made an offensive remark, despite being physically compliant and presenting no threat. *Burgess*, 735 F.3d at 470, 475. We found a constitutional violation, explaining that "there is no need for *any* force when a detainee is handcuffed, non-threatening, and not trying to flee." *Id.* (emphasis added) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). After *Burgess*, it is "beyond debate" that performing a takedown on a detainee who is physically compliant, not a threat, and not attempting to flee "violate[s] the Fourth Amendment." *White*, 137 S. Ct. at 551.[4] Taking the facts as we must at this stage of the case, *Burgess* is directly on point.

---

[4] Banks's only attempt to distinguish *Burgess* is based on his contention that Evans was physically resistant. Once again, we may not entertain arguments that require us to depart from the district court's account of the facts. *Jones*, 736 F.3d at 692–93.

Banks points to *Standifer v. Lacon*, 587 F. App'x 919 (6th Cir. 2014), but that case is distinguishable. In *Standifer*, an unpublished case, a dash-cam video showed the handcuffed plaintiff "twisting, turning, and kicking," and undisputedly kicking a police officer in the groin. *Id.* at 924–25. The officer then performed a takedown. *Id.* at 924. We found the officer's actions objectively reasonable. *Id.* at 925. However, the key point was that, "unlike some other Sixth Circuit cases, there are no 'factual disputes' as to whether Standifer 'posed a threat or actively resisted arrest,'—she undisputedly did." *Id.* (quoting *Burgess*, 735 F.3d at 474). Here, the opposite is true. Given the district court's interpretation of the video, Evans was *not* a threat and *not* actively resisting. Thus, *Burgess* controls, not *Standifer*, and Banks was on notice that performing a takedown on Evans would violate the Fourth Amendment.

### D.      Feehan

Evans claims that Feehan used excessive force when he threatened to tase her, then twice pointed his taser at her. The district court concluded that Feehan was not entitled to qualified immunity because "[a] jury could reasonably conclude that Feehan intended to maliciously inflict gratuitous fear when he aimed his [t]aser directly at Evans's head." (R. 77, PID 2333–34.) Feehan argues that the relevant law was not clearly established. We agree.

Evans acknowledges that our court has never found that pointing a taser, as opposed to actually discharging one,[5] constitutes the use of excessive force. In fact, we have only addressed such a scenario once. In *Stricker v. Township of Cambridge*, the plaintiff called 911 and

---

[5] "It is clearly established in this Circuit that 'the *use* of a Taser on a non-resistant suspect' constitutes excessive force." *Kent v. Oakland Cty.*, 810 F.3d 384, 396 (6th Cir. 2016) (emphasis added) (quoting *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010)); *Goodwin*, 781 F.3d at 324, 327 ("We have held that even previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance.") (citing *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008)).

requested medical assistance for her son, who was incoherent and losing consciousness after a drug overdose. 710 F.3d 350, 354 (6th Cir. 2013). The plaintiff subsequently refused to allow police officers into the family home to check on her son, and the officers eventually forced entry to do so. *Id.* at 354–56. By that point, the plaintiff was in her locked bedroom. *Id.* at 356. An officer kicked in the door, "pointed a taser gun" at the plaintiff, "put a forceful pressure hold" on her to "force her to stand," checked her for weapons, and "roughly handcuffed her." *Id.* (internal citations omitted). We found no constitutional violation, explaining that the officer's actions were objectively reasonable because the plaintiff admitted "repeatedly disobey[ing] lawful officer commands," had "attempt[ed] to prevent medical personnel's access" to her son, and had "attempt[ed] to evade arrest by flight" by hiding in the bedroom. *Id.* at 364–65. Since we found no Fourth Amendment violation in *Stricker*, that case cannot constitute clearly established law sufficient to deny Feehan qualified immunity. *White*, 137 S. Ct. at 551.

With no cases from this court on point, Evans cites *Parker v. Asher*, 701 F. Supp. 192 (D. Nev. 1988), on which the district court also relied.[6] However,

> out-of-circuit precedent clearly establishes rights only in "extraordinary cases" when the out-of-circuit decisions "both point unmistakably to the unconstitutionality of the conduct complained of and are so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting."

*Hearring v. Sliwowski*, 712 F.3d 275, 282 (6th Cir. 2013) (brackets removed) (quoting *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)). *Parker* does not meet this standard.

---

[6] Evans also cites *McDaniel v. Yearwood*, No. 2:11-CV-00165-RWS, 2012 WL 526078, (N.D. Ga. Feb. 16, 2012), as did the district court. But *McDaniel* actually expressed doubt about the holding in *Parker* and granted qualified immunity on the grounds that the law with respect to tasers was not clearly established. *Id.* at *27.

In *Parker*, the plaintiff, a prison inmate, sued under both the Eighth and Fourteenth Amendments after a guard "allegedly pointed a loaded taser gun at [him] and threatened to fire it." 701 F. Supp. at 193. Applying the Supreme Court and Ninth Circuit precedents that controlled in 1988, *Parker* held that, under the subjective standard governing Eighth Amendment claims, "guards cannot aim their taser guns at inmates for the malicious purpose of inflicting gratuitous fear," and that such conduct would also "shock[] the conscience" so as to support a Fourteenth Amendment Due Process Clause violation. *Id.* at 195. Six months later, however, the Supreme Court announced that excessive-force claims should be analyzed only after "identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Conner*, 490 U.S. 386, 394 (1989). Which constitutional right governs a particular claim "depends on the status of the plaintiff at the time of the incident." *Burgess*, 735 F.3d at 472. *Parker* was brought by a prison inmate; thus, post-*Graham*, it would be an Eighth Amendment case, and the guard's subjective intent, e.g., whether he acted "for the malicious purpose of inflicting gratuitous fear," would be relevant. *Parker*, 701 F. Supp. at 195; *see Burgess*, 735 F.3d at 472. But this case is governed by the Fourth Amendment, because Evans was in the process of being booked into the jail when the events at issue occurred. *Burgess*, 735 F.3d at 473–74. Thus, Feehan's subjective intent is irrelevant. What matters is whether Feehan's actions were objectively reasonable, *Kingsley*, 135 S. Ct. at 2473; *Burgess*, 735 F.3d at 472–73, and *Parker* has no direct application to this case.

Evans also argues that out-of-circuit cases dealing with officers who pointed firearms suffice to create clearly established law that governs this case. We disagree. On multiple occasions our court has rejected claims based on pointing a firearm. In *Collins v. Nagle*, officers were in the process of arresting a resisting suspect when the plaintiff approached the scene.

892 F.3d 489, 496–97 (6th Cir. 1989).  One of the officers "pointed a gun at him and requested that he leave."  *Id.* at 497.  The court found no constitutional violation, and observed:

> By giving an officer the ability to pull out and point a service revolver at someone without risking tort liability, he may be able to abort a potentially violent situation.  Conversely, to subject such displays of force to second guessing by a jury may increase the likelihood that the officer will wait until the situation escalates further before drawing his gun, and thereby end up having to (or believing he has to) shoot to protect himself or others.

*Id.* (brackets removed) (quoting *Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1231 (5th Cir. 1988)).  More recently, in *Dorsey v. Barber*, the defendant officer "brandish[ed] a firearm and order[ed] two suspects (who . . . had twice disregarded his lawful commands to stop) to lie on the ground for a period of two minutes, without firing the weapon or physically injuring them in any way or even touching them."  517 F.3d 389, 402 (6th Cir. 2008).  Our court found no violation of clearly established law, explaining that "[w]hile . . . the means used by [the officer] were more intrusive than necessary, a reasonable officer in his shoes could certainly believe that his actions . . . were not violative of the suspects' constitutional rights."  *Id.*  Finally, in *Stricker*, in addition to the detention discussed above involving a taser, our court found that, where another officer reasonably believed another resident of the house was attempting to flee, pointing her gun at that individual's head while handcuffing him did not constitute the use of excessive force.  710 F.3d at 363–64.

The only case from this court that Evans cites for the contrary proposition that is remotely on point is *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir. 1995).[7]  In *Pray*, officers mistakenly forced their way into the wrong unit of a duplex, "backed [one plaintiff] through the

---

[7] Evans cites *Miller v. Sanilac County*, 606 F.3d 240 (6th Cir. 2010), and *Holmes*, 78 F.3d 1041, but *Miller* was a handcuffing case and *Holmes* involved an officer wrenching the plaintiff's finger while attempting to remove a ring.  Neither case involves a firearm, a taser, or any similar weapon.

house at gunpoint and ordered him to get down on the floor," and "placed [] hands on [the plaintiff]'s shoulders and pushed him to the floor." *Id.* at 1157. Our court held that the plaintiff "had a clear right not to be physically forced to the floor at gunpoint." *Id.* at 1159. As the court later explained in *Dorsey*, however, the key fact in *Pray* was not that officers pointed their guns, but that "officers 'manhandled' the elderly plaintiffs in their home by forcing them to the floor, causing physical injuries, *after* having become aware that they were searching the wrong residence." *Dorsey*, 517 F.3d at 402 (emphasis in original) (citing *Pray*, 49 F.3d 1159–61).

In sum, Evans "fail[s] to identify a case where an officer acting under similar circumstances as [Feehan] was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552. Thus, "in the light of pre-existing law," it was not apparent that pointing a taser at Evans violated the Fourth Amendment. *Id.* We therefore reverse the denial of qualified immunity to Feehan.

## IV. STATE-LAW CLAIMS

Evans asserts that Banks committed a state-law battery against her when he performed the alleged takedown, and that Feehan committed an assault by pointing his taser at her. Banks and Feehan argue that the district court erred in denying them state-law immunity as to these claims.[8] Feehan also argues that Evans abandoned her taser-related claim against him.

### A. Jurisdiction and Standard of Review

We have interlocutory appellate jurisdiction to review the district court's denial of state-law immunity to Banks and Feehan under the collateral-order doctrine because Ohio law

---

[8] Feehan also asserts that his actions do not constitute an assault. We deem this argument waived, both because Feehan offers no argument or authorities in support of his assertion, *O'Donnell v. City of Cleveland*, 838 F.3d 718, 726 (6th Cir. 2016), and because Feehan did not raise the issue below, *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014).

provides immunity from suit rather than immunity from liability. *Sabo v. City of Mentor*, 657 F.3d 332, 336 (6th Cir. 2011) (citing *Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir. 2007)); *see* Ohio Rev. Code § 2744.02(C). We review the district court's decision de novo, "construing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 336–37 (citing *Chesher*, 477 F.3d at 796).

## B. Immunity Under Ohio Law

Under Ohio law, municipal employees are generally immune from civil suits unless an exception applies. *Goodwin*, 781 F.3d at 334 (citing Ohio Rev. Code § 2744.03(A)(6)). One exception provides that employees are not entitled to immunity when they act "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b); *Goodwin*, 781 F.3d at 334. Under Ohio law, "'reckless conduct' is the 'conscious disregard of or indifference to a known or obvious risk of harm that is unreasonable under the circumstances and is substantially greater than negligent conduct.'" *Burgess*, 735 F.3d at 480 (quoting *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012)). "An actor can be found to be reckless either based on his actual knowledge of a risk of harm or under an objective standard (that the risk is 'obvious')." *Goodwin*, 781 F.3d at 334–35. "Distilled to its essence . . . recklessness is a perverse disregard of a known risk." *O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008) (citations omitted).

## C. Banks

The district court found that a reasonable jury could conclude that Banks's actions were reckless. On appeal, Banks argues that the video evidence shows that Evans was not physically

compliant and therefore if a takedown occurred, his actions were reasonable. We disagree. Construing the evidence in the light most favorable to Evans, the videos show Banks lifted an unresisting Evans from the bench and slammed her to the floor, seriously injuring her. In *Burgess*, "[o]n Plaintiffs' alleged facts, the handcuffed, intoxicated, and physically compliant Burgess was slammed to the ground by two deputies, resulting in serious facial and skull fractures." 735 F.3d at 480. The court reversed the grant of summary judgment to the defendants based on state-law immunity, explaining that "[s]urely there is a question as to whether this conduct amounted to recklessness." *Id.* The same is true here, and the district court correctly denied Banks's motion for summary judgment based on state-law immunity.

### D. Feehan

Feehan first argues that Evans abandoned the taser-pointing claim by failing to respond adequately to Defendants' summary judgment motion on this point. We disagree. "[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991). Rather, the moving party "always bears the burden of demonstrating the absence of a genuine issue as to a material fact," and the district court is required "to examine the movant's motion for summary judgment to ensure that he has discharged that burden." *Id.* (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970)); *see* Fed. R. Civ. P. 56(a). In this case, the district court considered the evidence cited by Defendants in their motion—primarily the videos—and decided that Feehan had not met his burden. "No defense to an insufficient showing is required," so Evans did not abandon her claim against Feehan by not addressing the taser-pointing claim in her response to Defendants' summary judgment motion. *Adickes*, 398 U.S. at 161; *Carver*, 946 F.2d at 454–55.

Feehan next argues that he is entitled to immunity under Ohio law. Feehan asserts that he "never had his finger on the trigger of the taser, and as such, there was no possibility of it being activated." (Appellants' Br. at 36). He further argues that he "knew Evans was not in fear from the taser because she had just boasted to him that she had been tased for fun." (*Id.*) These conclusions require that we make inferences in Feehan's favor; however, a reasonable jury could conclude otherwise.

Viewing the video in the light most favorable to Evans, Evans was handcuffed, surrounded by officers, and under Banks's control. She was not attempting to escape and presented no danger to anyone. Feehan threatened to tase her and told her it would hurt. Then, when Evans merely turned her head to complain about Banks's hold on her arms, Feehan pointed his taser directly at her face from only a few feet away.[9] On these facts, a reasonable jury could conclude that Feehan had no legitimate reason to threaten to tase Evans, and pointed the taser at her face "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).

## V. CONCLUSION

For the foregoing reasons, we **DISMISS** Banks's appeal to the extent his arguments present challenges to the facts; **AFFIRM** the district court's decision as to Banks in all other respects; **REVERSE** the denial of qualified immunity to Feehan on Evans's Fourth Amendment excessive-force claim; **AFFIRM** the district court's denial of state-law immunity to Feehan; and **REMAND** to the district court for further proceedings consistent with this opinion.

---

[9] Evans points to the MCSO's use of force policy, which states that "[e]mployees must not intentionally aim the Taser at a person[']s head, neck, or groin," (R. 50-7, PID 676), and which Feehan was disciplined for violating.